## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| DAVID G. HAYDUK, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) CIVIL ACTION NO. 3:2005-294 |
| | ) |
| CITY OF JOHNSTOWN, and JEFFREY F. | ) |
| SILKA, individually and in his capacity | ) JUDGE GIBSON |
| as City Manager, | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

### I. SYNOPSIS

The above-captioned matter is before the Court on the Parties' cross motions for summary judgment. Plaintiff claims that Defendants interfered with his rights under the Family and Medical Act by failing to advise him of his rights under the Act, failing to offer him leave under the Act, terminating him as a result of absences he claims were protected by the Act and, post-termination, refusing to provide him leave under the Act and to rehire him. He seeks recovery under the remedial provisions of the Act itself as well as the general remedial provisions of 42 U.S.C. § 1983. Defendants claim that Plaintiff never qualified for the protections of the Act, and that Defendant Silka has immunity from suit.

For the reasons given below, the Court will deny Silka's claim of immunity in part and reserve judgment in part pending resolution of an issue of material fact; dismiss Plaintiff's § 1983 claims; recast Plaintiff's wrongful termination claim as a claim of discrimination and/or retaliation and dismiss Plaintiff's remaining interference claims; dismiss the wrongful termination claim in part; find that there are issues of material fact regarding the remainder of the wrongful termination claim; and reopen

1

discovery regarding Defendants' reasons for terminating Plaintiff;

## II. BACKGROUND

David Hayduk [hereinafter Plaintiff] was born in 1943. Document No. 46-4 p. 9. He has apparently lived his entire life in the same house in Johnstown, Pennsylvania. *Id.* So far as the Court can determine, he lived alone at all times relevant to the above-captioned action. *See id.* at 8-9.

From the early 1990s until his termination on September 10, 2003, Plaintiff was employed full time by Defendant City of Johnstown [hereinafter City] as a residential rehabilitation inspector. *Id.* at 17. He was classified as a non-union, non-supervisory employee. Document No. 46-4 pp. 18-19; Document No. 46-6 p. 44; Document No. 46-8 p. 50. At the time of his termination, Plaintiff's job paid \$24,000 per year. Document No. 46-6 p. 11.

As part of a federally funded program administered by the City, Plaintiff was assigned to inspect houses within the City with an emphasis on "windows, doors, furnaces, siding, chimneys, [and] sidewalks." Document No. 46-4 p. 22. He would then estimate the cost of improving those items and write up bid specifications. Document No. 46-4 pp. 20-21. After the bid had been awarded he would monitor the contractor's work and then perform a final inspection to assure that it had been satisfactorily completed before the City's final payment. Document No. 46-4 p. 21; Document No. 46-6 p 32. Plaintiff also performed followup inspections; if the owners had kept up their property the City would forgive the grants that had been used to pay for the work.[1] Document No. 46-4 pp. 143-44.

Plaintiff would generally visit a site eight times during the course of a typical three-week rehabilitation. Document No. 46-4 p. 24. His work "[o]ccasionally" required him to use a ladder; he

---

[1] Plaintiff refers in the same sentence to both "half-year foregivenesses" and a maintenance period of seven years as a requirement of the foregiveness; the Court assumes that he meant "months" instead of "years." Document No. 46-4 p. 143.

2

always worked alone in the field. *Id.* at 23. Plaintiff's regular work hours were 8 a.m. to 4:30 p.m. *Id.* at 28. He was not required to punch in when he arrived at City Hall, but was required to sign out when he left the office for an inspection. *Id.* at 28-30.

Beginning in 2000 and continuing until his termination, Plaintiff had the use of a City vehicle for his inspections. *Id.* at 31. It was parked in a lot located between his house and City Hall; he would typically drive from his home to the lot and then take the City car to City Hall and would reverse the procedure at the end of the day. *Id.* at 226-27. However, the City car was old and "broke down constantly." Document No. 46-6 p. 29. When it did, Plaintiff would use his personal automobile. From the perspective of Ronald Andrews, his immediate supervisor, "that was not a problem." *Id.*

Plaintiff would also use his own car if it was more convenient or if there were other "extenuating circumstances." Document No. 46-4 p. 232. He claims that he was not aware of any city policy to the contrary, at least before August of 2003. *Id.* at 232-33. The City also had a written policy that forbade operation of the City vehicle outside the City limits except under circumstances inapplicable to Plaintiff. Document No. 46-10 p. 16. Plaintiff claims not to have seen it; that his understanding of City policy, at least before August of 2003, was based on discussions in weekly staff meetings; and that he believed, based on those discussions, that the City's policy was merely to "[u]se the vehicle as much as you can, unless it's broke down." Document No. 46-4 p. 36. Plaintiff would, therefore, briefly operate the City vehicle outside the City if he believed it was the most efficient way to travel between jobs. *Id.* at 44- 48.

During the course of his employment with the City, Plaintiff underwent several medical procedures. In approximately 1994 he had a bilateral radial keratotomy to correct his vision; although he wore glasses at one time he no longer needed them, at least as of August 7, 2006. Document No.

3

15-2 p. 3 [2]; Document No. 46-4 p. 92-93. He visits Dr. Polito, the ophthalmologist who preformed the procedure "every few years," so that the doctor can "see what's going on." Document No. 46-4 p. 94.

In February of 2001, after complaining for some months of pain that had earlier been diagnosed as gastroesophogeal reflux, Plaintiff was diagnosed by Dr. Cyril Nathaniel with multivessel coronary artery disease and underwent a triple coronary artery bypass shortly thereafter. Document No. 46-4 pp. 53, 67-71; Document No. 47-13 p. 3. Dr. Nathaniel subsequently prescribed daily aspirin, Lipitor, a drug used to control serum cholesterol levels, and various drugs to control blood pressure, including Norvasc and Accupril, the two blood pressure medications Plaintiff was taking at the time of his termination. Document No. 46-4 pp. 54-55, 81-82; Document No. 47-13 p. 4. Dr. Nathaniel also apparently prescribed an over-the-counter potassium supplement. Document No. 46-4 pp. 96-99; Document No. 47-13 p.4. Post-surgery, Plaintiff saw Dr. Nathaniel once or twice a year "[o]n an official basis," but also saw and spoke with the doctor when he went "in for pills," for a total of "maybe 10, 12 times a year . . . ." Document No. 46-4 pp. 56, 81, 83.

In addition to Plaintiff's medications, Dr. Nathaniel prescribed a course of cardiac rehabilitation that Plaintiff claims to have pursued "religiously" several times a week, from roughly a month after his surgery until early 2006. Document No. 15-2 p. 2; Document No. 46-4 pp. 71-74, 79-80. The rehabilitation center was at Lee Hospital, approximately "five minutes" from City Hall. Document No.

---

[2] Document No. 15-2 is a report from Plaintiff's medical expert, Gordon A. Gress, M.D. It was filed on July 14, 2006. Document No. 15-2. Defendants made no objection to its admissibility at that time; when they filed their motion for summary judgment on March 16, 2007, Document No. 41; or when they filed their response to Plaintiff's motion for partial summary judgment on March 27, 2007. Document No. 48. Defendants did, however, file a motion *in limine* on April 29, 2008, which seeks to exclude Dr. Gress's written report and testimony at trial on the ground that Dr. Gress had an active-retired medical license at the time he examined Plaintiff which rendered him ineligible to examine Plaintiff. Document No. 94 & Exhibit A; Document No. 95.

As an initial matter, the motion *in limine* comes far too late for the Court to exclude the report from its summary judgment determinations. More generally, the only authority Defendants have cited in support of exclusion is "49 Pa. Code §§ 16.1 *et seq*." Document No. 95 p. 2. The Court can, however, find nothing in the code that would prevent Dr. Gress from acting as an expert in this case.

15-2 p. 2; Document No. 46-4 p. 69. Throughout the remainder of his employment with the City, Plaintiff left work for the sessions and was paid for the 45 minutes to an hour he was gone.[3] Document. No. 46-4 pp. 79-80; Document No. 44 p. 2 ¶ 17; Document No. 49 p. 3 ¶ 17. He did, however, miss roughly five to six sessions per month due to conflicts with work. Document No. 46-4 p. 80. The rehabilitation was evidently successful; Plaintiff's expert reported that, at least as of March 4, 2005, the date of his report, Plaintiff was "able to walk on a treadmill for an impressive rate and time," Document No. 15-2 p. 4, and, indeed, Plaintiff himself has testified that he feels that he has recovered from the surgery. Document No. 46-4 p. 77.[4]

Plaintiff has also had several infected teeth extracted by Dr. Hertzler, an oral surgeon, on referral from various general dentists. Document No. 46-4 pp. 101-105. The first extractions occurred in approximately 1999; Dr. Hertzler removed two more infected teeth shortly after Plaintiff's termination in September of 2003[5] and performed further extractions of infected teeth in 2004 and 2005.

---

[3] Although the parties have agreed that Plaintiff was permitted to attend the rehabilitation sessions, both Plaintiff's immediate supervisor, Ronald Andrews, and Curtis Davis, who was the Deputy City Manager at the time of Plaintiff's termination, testified that they were unaware that Plaintiff was attending the cardiac conditioning program during working hours. Document No. 44 p. 2 ¶ 17; Document No. 49 p. 3 ¶ 17; Document No. 46-5 p. 48; Document No. 46-12, p. 26.

[4] More recently, Plaintiff has denied that he "has ever fully recovered from the open heart surgery . . . ." Document No. 49 p. 3 ¶ 16. However, in light of the evidence in the record, such a conclusory allegation does not raise a material issue of fact for purposes of summary judgment. *See McCabe v. Ernst & Young*, LLP, 494 F.3d 418, 436-37 (3d Cir. 2006) (citing *Podobnik v. U.S. Postal Serv.*, 409 F.3d 584, 594 (3d Cir. 2005)). The Court also notes that Plaintiff's expert's report suffers from internal inconsistencies, first claiming ever-worsening dyspnea [shortness of breath] "on exertion with excessive talking and with walking and with unusual exertion," Document No. 15-2 p. 2, then touting Plaintiff's "impressive" performance on the rehab treadmill as evidence that there was no medical reason that Plaintiff could not "perform his job as Rehabilitation Specialist . . . ." *Id.* at 4; The American Heritage Stedman's Medical Dictionary 246 (2d ed. 2004) (defining "dyspnea").

[5] Plaintiff has offered a letter from Dr. Hertzler stating that on September 18, 2003, Plaintiff presented with two teeth that "were severely broken down," with "moderate swelling" and "a purulent discharge." Document No. 15-3. Dr. Hertzler extracted both teeth, placed Plaintiff on antibiotics, and opined that "it would have been very difficult for [Plaintiff] to perform his duties at work for at least 5 to 7 days prior to 9-18-03." *Id.*

5

Document No. 46-4 pp. 102-04; Document No. 15-3. Plaintiff has testified that Dr. Hertzler also performed oral surgery related to implants, Document No. 46-4 p. 102, but that is called into question by his expert's report that he has "an upper plate and a lower partial plate." Document No. 15-2 p. 3. Plaintiff states that he also saw his regular dentist "once a month" in 2003 for fillings and bonding. Document No. 46-4 p. 105.

Dr. Brisini, a urologist, removed a gowth in Plaintiff's bladder sometime in the 1980s, and Plaintiff has returned every six months thereafter for a followup cystoscopy. Document No. 15-2 p. 2; Document No. 46-4 p. 132. By 2002 Plaintiff was also seeing Dr. Brisini for prostate problems. Document No. 46-4 p. 132. In addition, Plaintiff had a right inguinal hernia repair in April of 2003. Document No. 15-2 p. 2; Document No. 46-6 p. 48.

In 2002 and 2003, the City allowed its employees either 12, 14 or 18 new sick days every year; testimony varied. Document No. 46-5 p. 58, Document No. 46-6 p. 25. Whatever their number, unused sick days could be carried over from year to year. Document No. 46-4 p. 78; Document No. 46-6 p. 26. Plaintiff had apparently not carried over sufficient sick days into 2002, and ultimately used a total of 31 days of sick and unpaid leave that year. Document No. 46-6 p. 25. He was, however, neither disciplined nor formally counseled about these absences, Document No. 46-5 p. 34; Document No. 46-6 pp. 26-27, 28, 47; Document No. 46-8 p. 54, and, indeed, claimed to never have been so much as criticized for his absenteeism before August of 2003. Document No. 46-6 p. 47; Document No. 46-4 pp. 126-27.

Plaintiff also expended more than his allotted number of sick days in 2003. By the time of his discharge, he had used 28 days of sick and unpaid leave. Document No. 46-6 p. 25. This time, however, his frequent absences did not go unremarked. Instead they, and especially a "[p]attern of

6

Thursday and Friday absences," including Friday, August 1; Thursday, August 7; Thursday and Friday, August 14 and 15; Thursday and Friday, August 21 and 22; Friday, August 29; and Friday, September 5, constituted one of the grounds for Plaintiff's dismissal. Document No. 47-10.

At his deposition Plaintiff could not recall the reason for his absence on August 1, 2003, but said it was "[p]robably sinus." Document No. 46-4 p. 120. He also could not recall whether he had complied with his department's policy requiring workers who would not be at work that day to notify the City by 8:15 a.m. *Id.*; Document No. 46-10 p.13. Plaintiff did, however, unequivocally state that his August 7, 2003 absence was caused by "[s]inus." Document No. 46-4 p. 121. He also claimed that on August 8, 2003 he furnished a doctor's excuse for the August 7 and possibly the August 1 absences. *Id.* at 121-26. There is nothing in the record regarding the contents of the excuse, but in a meeting on August 8, 2003, Plaintiff did tell his immediate supervisor, Ronald Andrews, and Deputy City Manager Curtis Davis that "he had a sinus issue." Document No. 46-12 pp. 20-21, 26; Document No. 46-4 pp. 137-38. This prompted Davis to require that Plaintiff provide "verification" from a doctor of any claimed condition or medical reason for his absences. Document No. 46-12 p. 27-28; Document No. 47-11 p. 2. Davis testified that he never received such verification. *Id.* at 27.

During this meeting Andrews told Plaintiff that "he had run out of sick time." Document No. 46-5 pp. 30-31; Document No. 46-6 p. 28; Document No. 47-11 p.2. Plaintiff was also reminded of the necessity of "reporting off" by calling the City to notify it that he would not be at work that day. Document No. 46-5 p. 33. He had failed to do so "more than one" time. *Id.* Plaintiff was further advised that he was not to travel outside the City limits in a City-owned vehicle. Document No. 46-6 pp. 28-29. Andrews subsequently memorialized the meeting in a memorandum to Silka dated August 15, 2003. Document No. 46-4 pp. 135-37, 230.

7

On Thursday, August 14, 2003 Plaintiff testified that he was performing an inspection when he tripped on a "bad sidewalk," fell, and twisted an ankle. Document No. 46-4 p. 146. He had some communication with City Hall on the City-issued portable radio that he carried, although it is unclear from the record whether he informed his employer of either his injury or his intent to attempt to see his primary care physician, Dr. Wisniewski, immediately. *Id.* at 147-49. Plaintiff was unable to see Dr. Wisniewski on either August 14 or August 15, and neither returned to work on August 14 nor reported for work on August 15. *Id.* at 149-51, 153. He did, however, return his City car to the lot after his abortive August 14 attempt to see the doctor. *Id.* Plaintiff also "think[s]" that he notified the City that he would not be at work on August 15. *Id.* at 155.

Plaintiff ultimately had his ankle examined by Dr. Brisini, who practiced general medicine as well as urology, before going to work on Monday, August 18, 2003. *Id.* at 156-58, 160. Dr. Brisini wrote an excuse describing the injury, but did not sign it or identify the dates on which Plaintiff missed work because of his twisted ankle. *Id.* at 158-61. There is nothing in the record to indicate when Plaintiff supplied the City with this excuse. At the depositions it was attached to a letter from Plaintiff to Andrews dated August 20, 2003, which purported to explain Plaintiff's absences on August 14 and 15. *Id.* at 143; Document No. 46-5 p. 26. Plaintiff testified, however, that he had submitted the doctor's excuse separately. Document No. 46-4 p. 158.

Dr. Brisini also wrote an order for an x-ray, and instructed Plaintiff to have the x-ray taken "if [his ankle] did not get any better." *Id.* at 159. There is nothing in the record to indicate that Plaintiff ever got the x-ray or sought further treatment for his ankle injury.

Plaintiff missed work again on Thursday, August 21 and Friday, August 22, 2003. *Id.* at 166; Document No. 47-10. At his deposition, he could not state with certainty why he had been absent those

8

days, but ultimately, after stating that he believed he had seen Dr. Wisniewski for "sinuses" on August 25, 2003, but was "not sure" that was the reason, said the reason for his absence "was sinus." Document No. 46-4 pp. 167, 169. Later in the same deposition he said that the cause of this absence was "[p]robably a combination, blood pressure and sinuses." *Id.* at 176.

The medical excuse Plaintiff obtained on August 25, 2003 for the August 21-22 absences was not signed by Dr. Wisniewski but rather by Kimberly Wisniewski. *Id.* at 171. Although Plaintiff knew she saw patients in Dr. Wisniewski's office, he did not "know if she [was] a doctor or not." *Id.* The excuse did not identify any specific malady, but merely stated that Plaintiff had suffered "medical problems." *Id.* at 168. Plaintiff said that when he returned to work on August 25 he had "probably mentioned it was sinus again" to someone, but could not recall. *Id.* at 169.

On Friday, August 29, Plaintiff was again absent from work. He "woke up early in the morning and [his] eyes were swollen shut," to the point that he needed to "feel the walls to go [to] the bathroom . . . ." *Id.* at 177; Document No. 46-6 pp. 49, 51. He claims that he was not able to call City Hall or for any assistance because his home phone was out of service; he could not find his cell phone, which was possibly in his car; and his City-issued radio was, per City policy, in its charger at City Hall. Document No. 46-5 pp. 179-87; Document No. 46-6 pp. 51-52.

Plaintiff did not think about calling a doctor, but self-diagnosed his problem as "[j]ust part of the sinus deal, just another step, getting worse." Document No. 46-6 p.184. He did, however, "hit the antibiotic," taking "[w]hatever was prescribed to [him] at the time." *Id.* at 189. His condition improved over the Labor Day weekend, although Plaintiff did not leave his home until he returned to work on Tuesday, September 2, 2003 . *Id.* at 189-91.

Plaintiff proffered a medical excuse on September 2, 2003, again signed by Kimberly

9

Wisniewski. *Id.* at 192-93; Document No. 46-6 p. 69. The record does not state the contents of the excuse, although it does contain the following notation from Ms. Wisniewsky, dated September 2, 2003: "Patient came in the second time in two weeks requesting a slip for missed work due to sinus headache, I instructed patient I would give him one more slip and will need appointment when he is ill." Document No. 46-4 pp. 173-75. Plaintiff may have made a followup appointment; it is certain that he never kept it. *Id.* at 194-95.

At the behest of Davis and Defendant Silka, Plaintiff also wrote a letter explaining both his absence and his failure to contact City Hall on August 29, 2003. *Id.* at 193; Document No. 47-11 p. 5. It stated that "[a]s of Sunday August 31st [he] was bedridden for 72 hours." Document No. 47-11 p. 5. Presumably referring to a followup appointment which he never kept, Plaintiff wrote that "[a]t [his] next appointment the doctor [was] going to decide if [Plaintiff] need[ed] surgery to prevent [his] face from swelling and [his] eyes swelling shut, which [was] the source of [his] health problems." *Id.*; Document No. 46-4 pp. 194-95.

On September 4, 2003, Silka conducted a "due process hearing" at which Plaintiff, Andrews and Davis were present. Document No. 47-11 p.2. Document No. 46-8 p. 36. Its purpose was to discuss Plaintiff's "failing to report to work and not calling off on August 29, 2003 and the fact that he [had] utilized all of his leave time." Document No. 47-11 p.2. The meeting also sought to address "a distinct absentee pattern" of Thursday and Friday absences in August of 2003. *Id.* Andrews found Plaintiff's Friday absences to be especially problematic because if Plaintiff's inspections were not completed by Friday morning he had a problem paying his contractors. Document No. 46-6 p.38. Plaintiff was informed that his benefits were "based upon a 2080-hour work year and uncompensated absences [went] against the required work time," *id.* at 3, and that if he persisted in his excessive

10

absenteeism he could be placed on either part-time status, which would eliminate his benefits including health insurance, or terminated. Document No. 46-4 pp. 197, 216.

For his part, Plaintiff presented the letter of explanation, Document No. 47-11 p. 5, discussed above, and informed the panel that "his absentee pattern on Thursday and Friday [was] due to his sinus and blood pressure conditions that [left] him exhausted by Thursday." *Id.* at 3. Notwithstanding Plaintiff's averments at the hearing, it resulted in a written reprimand for not reporting to work on August 29, 2003 and not notifying the City of his absence. *Id.* Silka also imposed the following action plan:

1. Mr. Hayduk shall call into the office of the Department of Community and Economic Development [the office for which he worked] to report when he will not be at work.
2. Mr. Hayduk shall provide the Director of Community and Economic Development [Andrews] a doctor's excuse, detailing why he was unable to report for work and releasing him to report for work, for each absence.

Failure to comply with the terms of the Action Plan shall result in further disciplinary action, which may include termination.

*Id.*; Document No. 46-4 pp. 216-17; Document No. 46-5 pp. 9, 16, 34; Document No. 46-6 pp. 17-18. Although Plaintiff was aware of the action plan on September 4, 2003, it was not signed, and the written reprimand was not issued, until September 9, 2003. Document No. 46-4 pp. 214-18; Document No. 46-5 pp. 69-70; Document No. 47-11 pp. 3-4.

On the morning of Friday, September 5, Plaintiff "had a headache" and "was not feeling good," but felt constrained after the previous day's meeting to report to work. Document No. 46-4 p. 223. He drove his own car to City Hall, passing by the lot in which his City car was kept since "it was extremely hot," his personal vehicle had air conditioning, and he was not feeling well. Document No. 46-4 p. 228, 230; Document No. 46-6 p. 71. He subsequently left City Hall in his own car to perform his assigned inspections. Document No. 46-4 p. 223.

11

During the course of the first inspection, while walking back to his car, Plaintiff "passed out or fainted or whatever" near the automobile. *Id.* at 233-34, 236. There were no witnesses. *Id.* at 234-35. Sometime later he regained consciousness and went into the house he had been inspecting for a glass of water. *Id.* at 234, 238; Document No. 46-6 p. 71; *see generally* Document No. 47-4. He did not tell the people in the house that he had passed out because they were "80-some years old" and "it would not have mattered." Document No. 46-4 p. 238.

Plaintiff had neither his personal cell phone nor his City-issued portable radio with him at the time. Document No. 46-4 pp. 235-36. He did, however, use his clients' telephone to call Kelly Barger, his office's secretary, and was advised to proceed to a house on Hagan Street. *Id.* at 223-24; Document No. 46-6 pp. 21, 71-72. During this conversation, although Plaintiff told Ms. Barger that he was not feeling well, he did not inform her that he had just been unconscious. Document No. 46-4 pp. 224, 239.

Plaintiff then proceeded to the Hagan Street address, even though he had been previously instructed by his immediate supervisor, Andrews, that it was imperative that he complete a final inspection on a different house in another part of the City by 11 a.m. Document No. 46-5 pp. 70-71; Document No. 46-6 pp. 32, 72-73, 81-82. After the conversation with Ms. Barger, with the possible exception of a phone call that Plaintiff may have made but "can't recall" on September 8, 2003, there was no further direct communication between Plaintiff and City Hall until Tuesday, September 9, 2003, despite Andrews' and Silka's attempts to locate him during the remainder of September 5, 2003. Document No. 46-4 p. 262; Document No. 46-5 p. 71; Document No. 46-6 pp. 18-19, 32-33; Document No. 47-12 p. 3.

Plaintiff's house was "approximately two minutes away" from the Hagan Street residence, and after the Hagan Street appointment Plaintiff decided to go home, change his pants, which had gotten

12

dirty when he passed out, "and take a pill because [he] knew that [his] blood pressure was up . . . ."
Document No. 46-4 pp. 224, 235, 241. He began to walk up the stairs to the second floor of his house
and lost consciousness again. *Id.* at 224. John Kondash, an acquaintance whom Plaintiff had asked to
come to his house after 4:00 p.m. to discuss his doing some work for Plaintiff, discovered Plaintiff with
his feet on the bottom step and his head resting against the wall on the landing.[6] *Id.* at 241, 243-44;
Document No. 46-6 pp. 38-43; Document No. 46-7 pp. 20-24; *see generally* Document Nos. 47-5, 47-7,
47-8. Plaintiff had a lump on his head and "was stoved up pretty bad." Document No. 46-4 pp. 248-49;
Document No. 46-6 p. 74; Document No. 46-7 pp. 24-26.

Kondash revived Plaintiff and tried to convince him to go to the hospital but Plaintiff, who was
"hurting and not [him]self" simply wanted to be put to bed. Document No. 46-4 pp. 244-45; Document
No. 46-6 p. 42-43; Document No. 46-7 pp. 24-27. Kondash helped Plaintiff up the stairs and into his
bed, then left; he had been at Plaintiff's house between ten and twenty minutes. Document No. 46-4
p. 245; Document No. 46-6 p. 42; Document No. 46-7 p. 26-28. He had not smelled any alcohol on
Plaintiff at any time. Document No. 46-7 p. 29. Kondash called Plaintiff later that night to check on
his condition, which was essentially unchanged; he still "didn't sound too good." Document No. 46-7
pp. 27-29; Document No. 46-6 p. 42.

Plaintiff drove himself to the hospital the next morning, although he felt "barely" well enough
to do so. Document No. 46-6 pp. 247-48. Plaintiff was evaluated for syncope.[7] Document No. 15-2
p.3; Document No. 46-11 pp. 2-3; Document No. 47-13 p. 3. After several hours in the emergency

---

[6] Given the conflicting accounts in the record, it is impossible to determine the exact sequence and timing of events
from the point Plaintiff spoke with Ms. Barger until he was discovered some time after 4:00 p.m. by Kondash. To the extent
that this information is material to the parties' claims or defenses, it will have to be established by the jury.

[7] "Syncope" is "[a] brief loss of consciousness caused by a sudden fall of blood pressure or failure of the cardiac
systole, resulting in cerebral anemia." The American Heritage Stedman's Medical Dictionary 801 (2d ed. 2004).

13

room, he was admitted to UPMC-Lee Regional Hospital at 12:44 p.m.on September 6, 2003. Document No. 46-4 pp. 249-50; Document No. 47-15 p. 2. Plaintiff had "[made] it clear during several conversations that he want[ed] and need[ed] to be hospitalized." Document No. 47-15 p. 3; Document No. 46-11 p. 3. He received a CAT scan which revealed "a small right lacunar infarct,[8] probably old." Document No. 15-2 p. 3; Document No. 47-13 p. 3; Document No. 47-15 p. 13. He also suffered from hypokalemia, or a low serum potassium level. Document No. 15-2 p. 3; Document No. 47-13 p.3. An electrocardiogram "revealed nonspecific ST-T wave changes and borderline criteria for left ventricular enlargement." Document No. 15-2 p. 3; Document No. 47-13 p.3.

On Sunday, September 7, 2003, Plaintiff was given the option of remaining in the hospital or going home, although in any case he was not to return to work on Monday or operate a vehicle. Document No. 46-4 p. 254; Document No. 47-9. He elected to return home and was discharged with an order for an outpatient noninvasive ultrasonic carotid artery study *Id.* at 254, 260-61; Document No. 47-9; Document No. 47-15 p. 7. At the time of his discharge, the treating physician did not know the cause of the syncopal episodes, and Plaintiff could not recall whether his sinuses or blood pressure were mentioned as possible triggers. Document No. 46-4 p. 255-56.

Notwithstanding the doctor's orders, Plaintiff drove himself home. *Id.* at 255. There is nothing in the record to indicate that Plaintiff ever had the carotid artery studies. *See id.* at 261, 270; Document No. 15-2; Document No. 47-13. Indeed, the only followup to his syncopal epsiodes which Plaintiff can recall is a visit to his oral surgeon, presumably on September 18, 2003, during which Dr. Hertzler extracted two of Plaintiff's teeth. Document No. 46-4 pp. 269-71; Document No. 15-3.

---

[8] Lacunar infracts can cause ischemic strokes. The Merck Manuals Online Medical Library, the Merck Manual for Healthcare Professionals, http://www.merck.com/mmpe/sec16/ch211/ch211b.html, (last visited June18, 2008). This "tends to occur in elderly patients with diabetes or poorly controlled hypertension." *Id.*

14

On either September 6 or 7, 2003, Plaintiff asked his girlfriend to call Davis to tell him that Plaintiff was in the hospital and did not know when he would return to work. Document No. 46-4 p. 246. There was a message from Plaintiff's girlfriend on Davis's answering machine that he "got on Sunday evening," stating that Plaintiff "had gone to get looked at at the hospital." Document No. 46-12 pp. 48-49, 69-70. Davis could remember no further details regarding the content of the message. *Id.* Plaintiff may have phoned City Hall on Monday as well, but "can't recall." Document No. 46-4 p. 262.

Plaintiff returned to work on September 9, 2003. *Id.* at 263. He immediately filled out an accident report for September 5. *Id.* at 264; Document No. 47-8. At approximately 9:00 a.m. Plaintiff was called down to Silka's office for a meeting with Silka, Davis and Andrews. Document No. 46-4 p. 265; *see generally* Document No. 46-8 p. 42. Silka chaired the meeting. Document No. 46-6 p. 20. Plaintiff was given a written reprimand based on the September 4, 2003 hearing, and Plaintiff, Silka and Andrews signed the document. Document Nos. 47-11, 47-12.

At the meeting, Plaintiff gave an account of September 5, 2003 that was substantially similar to that described above; he also offered a doctor's excuse for his absence on September 8, 2003. Document No. 46-4 p. 267-68; Document No. 47-12 p. 3; Document No. 47-9. Silka responded that Plaintiff's account of the occurrences of September 5 "sounded like a fairytale." Document No. 47-12 p. 3; Document No. 46-6 p. 21; *see also* Silka's testimony at Document No. 46-6 p.26 (admitting that he would not have disciplined Plaintiff if Plaintiff had been "literally unconscious" on September 5, 2003). Plaintiff testified that he offered to sign whatever releases were necessary so that the City could review his medical records from his weekend hospitalization but that the City officials did not wish to see them. Document No. 46-4 p. 267, 269; Document No. 47-12 p. 4. He also testified, however, that he could not recall anything being said at the meeting that was not memorialized in the

15

minutes which are part of the record, Document No. 46-4 p. 271, and according to the minutes Plaintiff did not make such an offer to the City officials; he had instead attempted to sign a release at the hospital that would have allowed the City access to his records, and a hospital official had refused Plaintiff's request. Document No. 47-12 p. 4.

There was also a discussion of Plaintiff's failure to use his City vehicle on September 5, 2003, during which Andrews told Silka that he had not previously explained to Plaintiff the City's policy against using a personal vehicle on official business when a City car was assigned to the employee. Document No. 47-12 p. 4. Ms. Barger "was called in" to the meeting and confirmed that she had spoken with Defendant once at approximately 10:30 a.m. on September 5, 2003. *Id.*

Silka confined Plaintiff to "administrative duties" inside City Hall until further notice. Document No. 46-6 p. 56; Document No. 46-8 p. 33. Silka was "[n]ot specifically" worried that Plaintiff might pass out again, this time while operating a city vehicle; instead he said that Plaintiff "was just coming off an incident where he went AWOL and [the City] couldn't find him," and therefore Silka "did not want him going out again." Document No. 46-8 pp. 33-35. Silka, who had sole authority to fire an employee, terminated Plaintiff at the end of the workday on September 10, 2003. *Id.* at 14; Document No. 46-6 p. 13; Document No. 46-12 p. 18. The termination letter Silka gave to Plaintiff said that he had been fired for the following reasons:

a.    Failure to report an alleged work related injury on September 5, 2003.
b.    Use of you [sic] personal vehicle for City of Johnstown business, on September 5, 2003, contrary to agency policy.
c.    Unauthorized absence from work on September 5, 2003.
d.    Pattern of Thursday and Friday absences:    Friday August 1
                                                 Thursday August 7
                                                 Thursday August 14
                                                 Friday August 15
                                                 Thursday August 21
                                                 Friday August 22

16

Document No. 47-10.

Silka subsequently refused to rank the factors, stating that "[t]he discharge was based on a pattern of instances, not one particular subset there. It was taken as a whole, not as individual actions." Document No. 46-8 p. 21. He went on to state that "[i]n light of the past employment conferences that [had been conducted], each one of [the factors] could have been a terminable event based on the action plan that [they] were devising.[9] But these were looked on as wholes, as a whole category and not single issues." *Id.* at 21-22.

Plaintiff attributes the majority of his absences in August of 2003 and, indeed, the general malaise of which he complained throughout 2002 and 2003[10] to either high blood pressure, sinus infection, or both. It is undisputed that Plaintiff was being treated for high blood pressure at least from the time of his bypass surgery in 2001. The parties do not, however, agree on whether his blood pressure was well-controlled , especially during the period from approximately August 1, 2003 until his termination.

Defendant's expert claims that Plaintiff's medical records indicate that his hypertension "was controlled during the August-September 2003 timeframe" and that he had no complications from his

---

[9] Andrews testified that he would not have disciplined Plaintiff for using his personal vehicle on September 5, 2003, Document No. 46-5 p. 74; Document No. 46-6 p. 36. However, although Silka had met with Andrews and Davis after the September 9, 2003 due process hearing regarding Plaintiff's fate, Andrews had not expressed an opinion to Silka regarding whether Plaintiff should be terminated. Document No. 46-5 p. 22; Document No. 46-8 pp. 15-16, 22. Davis likewise testified that he had offered no opinion on Plaintiff's termination at the meeting. Document No. 46-12 pp. 19-20.

[10] This general malaise included bouts of "blurry vision," where "[e]very few months.... things [got] fuzzy" for Plaintiff. Document No. 46-4 pp. 93-94. Plaintiff never raised the matter of his blurry vision with his ophthalmologist, however, since Plaintiff believed that this was also caused by "the heart and the sinus" or high blood pressure. *Id.* at 94-95.

17

hypertension" during that time. Document No. 47-13 p. 5 ¶ 2. By contrast, Plaintiff's expert found that his blood pressure was "usually under fair control at best."[11] Document No. 15-2 p. 2. Plaintiff himself has given contradictory information on this matter, having testified in October of 2003 that during 2003 his doctors "had a heck of a time controlling [his] blood pressure" and "[c]hanged [his] medication a bunch of times," Document No. 46-6 p. 48, while testifying in 2006 that he had taken the same blood pressure medications from the time of his bypass surgery until approximately 2005. Document No. 46-4 pp. 81-82; *see also* Document No. 15-2 (confirming that "at the time of his termination [Plaintiff] was on the same medication" as in 2001).

Plaintiff claims that he has suffered from sinus infections since approximately 1999 or 2000. Document No. 46-4 pp. 110. He states that as a result he would miss work seven or eight times a year, for periods of from one to three days. *Id.* at 111-12. Plaintiff also states that throughout this period his primary care physician, whomever that has been, has treated these infections and that at least Dr. Wisniewski had written notes for Plaintiff to his employer when he was absent for that reason. *Id.* at 110-12, 137, 220. Plaintiff would also treat himself with antibiotics that were "left over from the previous time" he had suffered from a sinus infection. *Id.* at 121-22, 189.

Plaintiff stated that he was advised at some point that a "sinus lift" operation would help Plaintiff "an awful lot" if not cure his sinus problems. Document No. 46-4 pp. 107-08, 220-22; Document No. 46-6 p. 53. Although he could not give any particulars,[12] Plaintiff described the surgery

---

[11] Plaintiff also claims to suffer from hypertensive vascular disease. Document No. 34 p. 3 ¶ 8; Document No. 46-4 pp. 86-89. Nothing in the record has explained to the Court how, or indeed whether, this differs in Plaintiff's case from his previously-diagnosed hypertension.

[12] So far as the Court can determine, a sinus lift "is surgery that adds bone to [the] upper jaw in the area of [the] molars and premolars. . . . when there is not enough bone in the upper jaw, or the sinuses are too close to the jaw, for dental implants to be placed." Colgate World of Care, Oral & Dental Health at Any Age, at http://www.colgate.com (type "sinus lift" in the search window, click on "search," click on "Sinus Lift Surgery-Sinus Augmentation) (last visited June 18, 2008).

18

as "very painful" and "very dangerous," with a recovery period of "at least ten days or a week or two." Document No. 46-4 p. 221; Document No. 46-6 p. 53. He has testified that he intended to wait until the beginning of 2004, when his store of sick days would have been replenished, and have the operation. Document No. 46-4 pp. 202-03, 274; Document No. 46-6 p. 53. Plaintiff never did have the procedure, however; after his termination he lost his medical insurance and could not pay for it. Document No. 44 p. 3 ¶ 28; Document No. 49 p. 4 ¶ 28; Document No. 46-4 pp. 203-04.

Defendant claims that "[t]here is no documentation from any health care provider of Plaintiff ever seeking treatment from a health care provider for his sinuses prior to his termination." Document No. 44 p. 1 ¶ 6; Document No. 47-13 p. 6 ¶ 6. Plaintiff avers that such medical records do exist, Document No. 49 p. 2 ¶ 6, but they are not part of the record of this case and therefore will not be considered by the Court for purposes of deciding the instant motions.

Andrews knew from conversations with Plaintiff about Plaintiff's high blood pressure and blurry vision no later than 2001. Document No. 46-5 pp. 15, 48-49; Document No. 46-6 pp. 36-37. Plaintiff informed Andrews and Davis of his sinus problems during the August 8, 2003 meeting. Document No. 46-4 pp. 137-38; Document No. 46-12 pp. 20-21. He also stated, at either the August 8 [13] or September 4, 2003 meeting, that he was so exhausted from his health problems that he found it impossible to complete the week's work. Document No. 46-5 pp. 50-51; Document No. 46-6 pp. 37, 53.

The City's employee guidebook briefly describes provisions of the Family and Medical Leave Act [hereinafter FMLA or Act], including an employee's eligibility for leave for "[a] serious health

---

[13] Andrews' testimony was that the meeting "might have been" on August 15, 2003 but Plaintiff was not at work that day. Document No. 46-6 p. 37; Document No. 47-10. Andrews did, however, prepare a memorandum for Silka regarding the August 8, 2003 meeting that was dated August 15, 2003, Document No. 46-4 pp. 135-37, 230, which is likely the source of Andrews' confusion.

19

condition which renders the employee unable to perform the functions of his or her job." Document No. 46-10 p. 7. At his deposition Plaintiff could not recall if he had ever received the guidebook and now denies that he did. Document No. 46-4 pp. 51-52, 198; Document No. 49 p. 9 ¶ 72. Silka could not say whether a guidebook had been issued to Plaintiff. Document No. 46-4 p. 198.

Silka also testified that a poster describing the provisions of the FMLA was posted "on the main bulletin board on the first floor of City Hall" when he was hired in April of 2002 and remained there throughout his tenure as city manager. Document No. 46-8 pp. 11, 65-66; Document No. 46-9. Plaintiff, while stating that he did read notices on the bulletin board, could not recall ever reading anything "having to do with leave of absence from work." Document No. 46-4 pp. 199-202. Indeed, Plaintiff claims to have "[n]ever heard of" the FMLA as of September 2, 2003, although he also states that he had heard of an employee in 2002 taking FMLA leave "because she was having a baby." *Id.* at 199.

It is undisputed that Plaintiff never formally requested any sort of prospective leave to either attempt to rest and recover or to have the sinus lift surgery. Document No. 49 p. 11 ¶ 83. It is also undisputed that, except for the paid periods in which Plaintiff engaged in cardiac rehabilitation, the City or its agents neither offered Plaintiff any sort of leave beyond his paid sick and vacation days nor discussed with him "his right to unpaid time off for medical care under the Family Medical Leave Act." Document No. 46-5 p. 75; Document No. 46-8 pp. 47-48. On October 10, 2003, roughly a month after Plaintiff's termination, his attorney requested Plaintiff's reinstatement. Document No. 47 p. 13 ¶ 10. On October 17, 2003 the City refused. *Id.* Plaintiff filed the instant lawsuit on June 30, 2005, and the parties subsequently filed cross motions for summary judgment. Document Nos. 1, 41, 45.

20

## III. DISCUSSION

### A. Jurisdiction and venue

The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 2601 *et seq.*[14] Venue is proper pursuant to 18 U.S.C. § 1391(b).

### B. Legal standard for summary judgment

A "principal purpose[] of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses . . . and it should be interpreted in a way that allows it to accomplish [that] purpose." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265, 275 (1986). Fed. R. Civ. P. 56 must therefore "be construed with due regard not only for the rights of persons asserting claims . . . that are adequately based in fact to have [them] tried to a jury, but also for the rights of persons opposing such claims . . . to demonstrate . . . prior to trial, that the claims . . . have no factual basis." *Celotex*, 477 U.S. at 327, 106 S.Ct. at 2555, 91 L.Ed.2d at 276. Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). There is no issue of material fact "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party," *Matsushita Elec. Indus. Co., Ltd., v. Zenith Radio Corp*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538, 552 (1986) (citation omitted); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202, 214 (1986), and summary judgment therefore must be entered "against a party who fails to make a showing sufficient to establish the existence of an element

---

[14] Plaintiff has also stated a claim under 42 U.S.C. § 1983. Document No. 34 p. 2 ¶ 2. That statute's applicability to the instant action will be addressed *infra*.

essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322, 106 S.Ct. at 2552, 91 L.Ed.2d. at 273; *see also J.E. Mamiye & Sons, Inc. v. Fidelity Bank*, 813 F.2d 610, 618 (3d Cir. 1987) (holding that a "plaintiff will be out of court if he has not adduced sufficient evidence to get to a jury on every element of his case").

In order to meet its burden, the party moving for summary judgment need not "produce evidence showing the absence of a genuine issue of material fact"; it can instead merely "point[] out . . . that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325, 106 S.Ct. at 2554, 91 L.Ed.2d at 275.

The burden on the non-moving party is more substantial. Fed. R. Civ. P. 56(e)(2) states it as follows:

When a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must – by affidavits or as otherwise provided in this rule – set out specific facts showing a genuine issue for trial. If the opposing party does not so respond, summary judgment should, if appropriate, be entered against that party.

To meet its burden, the non-moving party may use any type of evidentiary material "listed in Rule 56(c), except the mere pleadings themselves"; this material need not, however, be "in a form that would be admissible at trial." *Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553, 91 L.Ed.2d at 274. While the non-moving party need not prove its case, it must show that there is a genuine issue for trial; a "mere scintilla of evidence" or a "metaphysical doubt as to the material facts" is not sufficient. *Anderson*, 477 U.S. at 251, 106 S.Ct. at 2511, 91 S.Ct. at 213; *Matsushita*, 475 U.S. at 586, 106 S.Ct. at 1356, 89 L.Ed. 2d at 552.

In deciding a motion for summary judgment, the Court "must view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor." *Farrell v. Planters*

22

*Lifesavers Co.*, 206 F.3d 271, 278 (3d Cir. 2000) (quoting *Armbruster v. Unisys Corp.*, 32 F.3d 768, 777 (3d Cir. 1994)); *see also Ely v. Hall's Motor Transit Co.*, 590 F.2d 62, 66 (3d Cir. 1978) (quoting *Smith v. Pittsburgh Gage and Supply Co.*, 464 F.2d 870, 874 (3d Cir. 1972)) (holding that the reviewing court must "resolv[e] all inferences, doubts and issues of credibility against the moving party") (internal quotation marks omitted). The non-movant must, however, "present more than just bare assertions, conclusory allegations or suspicions to show the existence of a genuine issue" for trial. *McCabe v. Ernst & Young*, LLP, 494 F.3d 418, 436-37 (3d Cir. 2006) (quoting *Podobnik v. U.S. Postal Serv.*, 409 F.3d 584, 594 (3d Cir. 2005)) (internal citations and quotation marks omitted); *see also Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888, 110 S.Ct. 3177, 3188, 111 L.Ed.2d 695, 716 (1990) (holding that the purpose of Rule 56(e) is "not to replace conclusory allegations of the complaint or answer with conclusory allegations of an affidavit"). "Specious objections will not . . . defeat a motion for summary judgment, but real questions about credibility, gaps in the evidence, and doubts as to the sufficiency of the movant's proof [] will." *El v. Se. Pa. Transp. Auth.*, 479 F.3d 232, 238 (3d Cir. 2007). If the Court is unable to render summary judgment on the entire action, it "should, to the extent practicable, determine what material facts are not genuinely at issue," and those facts "must then be treated as established in the action." Fed. R. Civ. P. 56(d)(1).

## C. The Family and Medical Leave Act, 29 U.S.C. § 2601 *et seq.*

In enacting the FMLA, Congress found, *inter alia*, that "there [was] inadequate job security for employees who [had] serious health conditions that prevent[ed] them from working for temporary periods . . . ." 29 U.S.C. § 2601(a)(4). To remedy the problem, it created a system of interlocking rights and responsibilities which was intended to "balance the demands of the workplace with the needs of families" by "entitl[ing] employees to take reasonable leave for medical reasons . . . in a

23

manner that accommodates the legitimate interests of employers." 29 U.S.C. § 2601(b)(1)-(3). The employee rights granted by the FMLA "set floors for employer conduct" which the employee may not bargain away or otherwise waive. 29 U.S.C. §§ 2652, 2653; *Callison v. City of Philadelphia*, 430 F.3d 117, 119 (3d Cir. 2005) (citation omitted); *see also Cavin v. Honda of Am. Mfg., Inc.*, 346 F.3d 713, 722 (6ᵗʰ Cir. 2003) (citations omitted) (holding that the provisions of the FMLA "apply even where the entitlements created by the Act are in excess of those that an employer would be willing or able to provide on its own").

In pertinent part, the FMLA entitles an eligible employee "to a total of 12 workweeks of leave during any 12-month period ... [b]ecause of a serious health condition that makes the employee unable to perform the functions" of his position. 29 U.S.C. § 2612(a)(1)(D). At the end of the leave, except under circumstances inapplicable to the case at bar, the employer must either return the employee to the position he held before taking the leave or to "an equivalent position with equivalent employment benefits, pay, and other terms and conditions of employment." 29 U.S.C. § 2614(a)(1). However, FMLA leave is only designed to allow the employee "to treat or attend to the condition rendering [him] unable to perform [his] job." *Spangler v. Fed. Home Loan Bank of Des Moines*, 278 F.3d 847, 851 (8ᵗʰ Cir. 2002). If at the end of his leave, the employee "remain[s] unable to perform the essential functions of [his] position" his employer is "under no obligation to reinstate [him] . . . ." *Id.*

The FMLA guarantees only unpaid leave, but either the employee or the employer may substitute paid leave "if the employee has earned or accrued it." 29 U.S.C. § 2612(c), (d); 29 C.F.R. §§ 825.100(a), 825.207. During the leave, the employer "must maintain [the employee's] coverage under any 'group health plan'" under the same terms as if the employee had been continuously employed throughout his leave. 29 U.S.C. § 2614(c)(1).

24

FMLA leave may be planned or unplanned. *See* 29 U.S.C. § 2612(e); 29 C.F.R. §§ 825.302, 825.303. It may also be taken and, indeed, "must be granted" if "'medically necessary,' on an intermittent or part-time basis." *Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 86, 122 S.Ct. 1155, 1160, 152 L.Ed.2d 167, 175 (2002) (citing 29 U.S.C. § 2612(b)(1)); *see also* 29 C.F.R. § 825.203. When taking intermittent leave, the employee may not be charged for more leave than he actually uses, although his employer "may limit leave increments to the shortest period of time that [his] payroll system uses to account for . . . use of leave, provided it is one hour or less." 29 C.F.R. §§ 825.203(d), 825.205.

The statutory and regulatory schemes of the FMLA suggest that an employee might take twelve medically necessary weeks of intermittent leave per twelve-month period indefinitely. The courts have held otherwise: the FMLA does not entitle an employee to take "unscheduled and unpredictable, but cumulatively substantial absences. . . . at a moment's notice for the rest of [his] life." *Collins v. NTN-Bower Corp.*, 272 F.3d 1006, 1007 (7th Cir 2001); *see also Spangler*, 278 F.3d at 853; *Brown v. E. Maine Med. Ctr.*, 514 F.Supp.2d 104, 110 n.9 (D. Me. 2007); *Johnson v. Moundsvista, Inc.*, No. Civ. 01-915 DWF/AJB, 2002 WL 2007833, at *6 n.6, 2002 U.S. Dist. LEXIS 16450, at *19 n.6 (D. Minn. Aug. 28, 2002). So long as "reliable attendance is a *bona fide* requirement" of a position, an employee's inability to comply with that requirement over the long term indicates that he is not qualified for the position, and therefore not eligible for leave under the FMLA. *Spangler*, 278 F.3d at 853 (citing *Collins*, 272 F.3d at 1007)); *Collins*, 272 F.3d at 1007 (holding that the FMLA should not be construed to provide more protection than the Americans with Disabilities Act [hereinafter ADA],

25

which "protects only persons who over the long run are capable of working full time");[15] *see also* 29 C.F.R. § 825.214(b) (stating that an employee who is "unable to perform an essential function of [his] position" at the end of his FMLA leave "has no right [under the FMLA] to restoration to another position . . .").

An employee's right to take FMLA leave, even unplanned leave, is conditioned on his notice to his employer. *Aubuchon v. Knauf Fiberglass GmbH*, 359 F.3d 950, 951-52 (7th Cir. 2004) (holding that "the employee's giving the required notice to his employer is the quid pro quo for the employer's partial surrender of control over his work force"). Failure to provide proper notice allows the employer to deny benefits under the Act even where an employee would otherwise be eligible. *Id.* If the leave is foreseeable, the employee must give at least 30 days notice if possible; if the need becomes foreseeable in a shorter period of time the employee must give notice "as soon as practicable," generally "within one or two business days" of the time the need arises. 29 C.F.R. § 825.302(a), (b).

"[E]xcept in extraordinary circumstances," an employee must also notify his employer within one or two business days of learning of the need for unforeseeable leave. 29 C.F.R. § 825.303(a). Where the employee has taken leave that qualifies under the FMLA but the employer is unaware of the reason, "the employee must notify the employer within two business days of returning to work of the reason for the leave" or be barred from "subsequent[ly] assert[ing] FMLA protections for the absence." 29 C.F.R. 825.208(e)(1). If, however, the employee does satisfy the notice requirements of the FMLA an employer "cannot deny FMLA relief for [the employee's] failure to comply with [the employer's more stringent] internal notice requirements" in the context of either foreseeable or unforeseeable leave.

---

[15] This is especially true in light of the fact that the ADA is far more liberal in its protections than the FMLA, allowing an "indeterminate amount of leave" as a "reasonable accommodation" while the FMLA limits leave to twelve weeks in any twelve-month period. 29 C.F.R. § 825.702(b)

*Cavin*, 346 F.3d at 722-23.

Verbal notice can be sufficient.[16] 29 C.F.R. §§ 825.302(c), 825.303(b). There are no "magic words" and "[t]he employee need not expressly assert rights under the FMLA or even mention the FMLA . . . ." 29 C.F.R. §§ 825.302(c), 825.303(b); *Sarnowski v. Air Brooke Limousine, Inc.*, 510 F.3d 398, 402 (3d Cir. 2007). When notice has been found to be deficient, "it has been because the employee failed to convey the reason for needing leave." *Sarnowski*, 510 F.3d at 403. The employee must state the reason for the leave with some specificity; since most requested leaves do not qualify under the FMLA to hold otherwise "would be to place a substantial and largely wasted investigative burden on employers." *Aubuchon*, 359 F.3d at 953.

Merely calling in sick does not meet the employee's burden. *Stevenson v. Hyre Elec. Co.*, 505 F.3d 720, 725 (7th Cir. 2007); *Collins*, 272 F.3d at 1008. Instead, the employee must "give[] the employer enough information for the employer to reasonably conclude that an event described in the FMLA § [2612(a)(1)] has occurred." *Cavin*, 346 F.3d at 723-24 (quoting *Hammon v. DHL Airways, Inc.*, 165 F.3d 441, 451 (6th Cir. 1999)); *see also Aubuchon*, 359 F.3d at 952 (noting that "[i]f you have brain cancer but just tell your employer that you have a headache, you have not given the notice that the Act requires"). Put another way, the employee "just has to give the employer enough information to establish probable cause, as it were, to believe that he is entitled to FMLA leave." *Aubuchon*, 359 F.3d at 953; *see also Sarnowski*, 510 F.3d at 402-03 (quoting *Woods v. DaimlerChrysler Corp.*, 409

---

[16] In extreme cases, not even verbal notice is required. An employer could receive sufficient notice of an employee's need for FMLA leave if, for example, he saw the employee break his arm, even if the employee never said a word. *Stevenson v. Hyre Elec. Co.*, 505 F.3d 720, 726 (7th Cir. 2007) (citing *Byrne v. Avon Prods.*, 328 F.3d 379, 381-82 (7th Cir. 2003)). Indeed, even an employee's behavior has been found to have been "so unusual" that it gave constructive notice of the employee's need for leave. *See id.* at 727 (finding notice where an employee's "response to a stray dog entering her workspace" was so extreme that her coworkers "eventually locked her out of the building"); *see also Burnett v. LFW, Inc.*, 472 F.3d 471, 479-80 (7th Cir. 2006) (holding that a "dramatic. observable change in . . . work performance or physical condition" can provide an employer with sufficient notice of an employee's need for FMLA leave).

F.3d 984, 990 (8th Cir. 2005)) (holding that "[i]n order to benefit from the protections of the [FMLA], an employee must provide his employer with enough information to show that he *may* need FMLA leave") (emphasis added in *Sarnowski*).

Once an employee has provided his employer with sufficient notice of his need for FMLA leave, the employer must, "within one or two business days if feasible," furnish to the employee "written notice detailing the specific expectations and obligations of the employee and explaining any consequences of a failure to meet these obligations." 29 C.F.R. § 825.301(b), (c). In the case of a brief absence, where the employer only learns its reason after the employee has returned to work, the employer may, upon "appropriate notice to the employee," retroactively designate the absence as FMLA leave within two business days of the employee's return. 29 C.F.R. § 825.208(e)(1). In either case, the notice must include advisements that the employee's leave "will be counted against [his] annual FMLA entitlement"; "any requirements for the employee to furnish medical certification of a serious health condition and the consequences of failing to do so"; and "the employee's right to restoration to the same or an equivalent job upon return from leave . . . ." 29 C.F.R. § 825.301(b)(1)(i), (ii), (vii). The written notice is "in addition" to the notice provision at 29 U.S.C. § 2619(a), which requires the employer to "post and keep posted, in conspicuous places," a summary of the "pertinent provisions" of the FMLA. *Ragsdale*, 535 U.S. at 88, 122 S.Ct. at 1160-61, 152 L.Ed.2d at 176; *see also Wilson v. Lemington Home for the Aged*, 159 F.Supp.2d 186, 193-94 (W.D. Pa. 2001) (citing 29 C.F.R. § 825.301(b)(1)) (holding that "the written notice is in addition to any employer handbook"). The more "comprehensive and individualized notice required by the regulations is [according to the Secretary of Labor] necessary to ensure that employees are aware of their rights when they take leave." *Ragsdale*, 535 U.S. at 88, 122 S.Ct. at 1160-61, 152 L.Ed.2d at 176 (citing 60 Fed.Reg. 2220 (1995)).

28

If the employer is uncertain whether the leave qualifies under the FMLA "he should make a preliminary designation," notify the employee, and "request such additional information from the employee's doctor or other reputable source as may be necessary to confirm the employee's entitlement." 29 C.F.R. § 825.208(e)(2); *Aubuchon*, 359 F.3d at 953 (citing 29 C.F.R. §§ 825.302(c), 825.303(b), (d); *Cavin*, 346 F.3d at 723-24); *see also Peter v. Lincoln Technical Inst., Inc.*, 255 F.Supp.2d 417, 441 (E.D. Pa. 2002) (holding that "the regulations are clear that once the employer determines that it requires more information to determine whether FMLA leave is being requested, the burden shifts to the employer to investigate further"); *Barnett v. Revere Smelting & Ref. Corp.*, 67 F.Supp.2d 378, 385-86 (S.D.N.Y. 1999) (holding that "[a]n employer's duty to conduct further inquiry into a request for leave is first triggered when an employee gives sufficient notice of a medical need for the requested leave") (citation and internal quotation marks omitted).

The primary avenue of further inquiry and, indeed, the principal anti-abuse provision of the FMLA is the health care provider's certification. *Manuel v. Westlake Polymers*, 66 F.3d 758, 763-64 (5th Cir. 1995); *see also* 29 U.S.C. § 2613. As discussed above, an employer may request this certification once an employee has provided sufficient information to invoke the FMLA and if an employee has provided the employer with adequate notice of an FMLA-qualifying condition and the employer fails to provide the written notice required by 29 C.F.R. § 825.301, "the employer may not take action against [the] employee for failure to comply with any provision required to be set forth in the notice," including that of medical certification. 29 C.F.R. § 825.301(f).

This does not, however, mean that an employer who fails to demand certification is thereafter

barred from disputing whether an employee had a serious medical condition.[17] *Call v. Fresenius Med. Care Holdings, Inc.*, 534 F.Supp.2d 184, 192-93 (D.Mass. 2008) (citing *Wheeler v. Pioneer Dev. Servs., Inc.*, 349 F.Supp.2d 158, 168 (D.Mass. 2004)) (reversing its holding in *Wheeler*, the only case in the federal system of which the Court is aware to have held that an employer's failure to demand certification did act as a bar to future challenges to the employee's condition). The statute itself does not mandate certification; to the contrary, its language is permissive, only stating that "[a]n employer *may* require" one. 29 U.S.C. § 2613(a) (emphasis added); *see also Novak v. MetroHealh Med. Ctr.*, 503 F.3d 572, 579 (6th Cir. 2007) (noting that the nearly identical permissive language in 29 U.S.C. § 2613(c)(1) regarding the employer's right to demand a second certification does not "requir[e] an employer to obtain a second opinion or else waive any future opportunity to contest the validity of the [first] certification"); *Rhoads v. FDIC*, 257 F.3d 373, 386 (4th Cir. 2001) (same). Moreover, limiting an employer's choices to either a demand for certification or waiver would be inefficient as it "would require every employer to invoke the full panoply of FMLA mechanisms or be prohibited ever after from challenging the legal adequacy of even the most paltry evidence regarding an employee's medical condition." *Call*, 534 F.Supp.2d at 192-93.

In pertinent part, a certification is sufficient if it includes "the date on which the serious health condition commenced" and its probable duration; "appropriate medical facts"; "a statement that the employee is unable to perform the functions of the position of the employee"; and, in the case of intermittent leave, "a statement of the medical necessity for the intermittent leave" and its expected

---

[17] In the event of a dispute, however, an employer's decision to forego its demand for certification may render its eventual burden insurmountable, even where the certification process could have established the absence of a serious health condition. *See Thorson v. Gemini, Inc.*, 205 F.3d 370, 381-82 (8th Cir. 2000) (finding that "[i]n the face of contemporaneous notes from Thorson's physician indicating that she was not to work," the conclusions of Defendant's expert, based on examinations "made long after the fact," could not raise an issue of material fact regarding Thorsen's incapacity).

duration . . . ." 29 U.S.C. § 2613(b). If the employer "has reason to doubt the validity" of the initial

certification the employer may require, at its expense, a second certification by a health care provider

whom it has "designated or approved." 29 U.S.C. § 2613(c). If the second opinion differs from the

first the employer may then require, again at its expense, the opinion of a third provider jointly

approved by the employer and employee whose opinion "shall be considered to be final and shall be

binding on the employer and the employee." 29 U.S.C. § 2613(d). For an ongoing condition, the

employer may also require recertification, albeit generally "no more often than every 30 days." 29

C.F.R. § 825.308.

For purposes of the instant inquiry, the FMLA proscribes two "relatively distinct" forms of

activity: interference with the Act's prescriptive rights and "discrimination based on the exercise of

[those] rights." 29 U.S.C. § 2615(a); *Callison*, 430 F.3d at 119. Interference includes "not only

refusing to authorize FMLA leave, but discouraging an employee from using such leave." 29 C.F.R.

§ 825.220(b). Discrimination includes the "use [of the] taking of FMLA leave as a negative factor in

employment actions, such as hiring, promotions or disciplinary actions."[18] *Callison*, 430 F.3d at 119

(citing 20 C.F.R. § 825.220(c)); *Conoshenti v. Pub. Serv. Elec. & Gas Co.*, 364 F.3d 135, 146 & n.9,

147 (3d Cir. 2004).

The proper classification of FMLA claims is more than an idle exercise in legal taxonomy;

---

[18] The Court realizes that this latter holding is at odds with some of its earlier rulings in the instant case, which held that Plaintiff's "lawsuit does not allege any pretextual or retaliatory dimension to his termination from Johnstown's employ." Document No. 33 pp. 4-5; *see also* Document No. 18. Subsequent to those rulings, however, the Court had occasion to examine the issue in greater detail and concluded, notwithstanding the "considerable confusion among courts of appeals and district courts concerning which types of FMLA claims are cognizable under which specific statutory provisions," that at least in the Third Circuit claims for wrongful termination under the FMLA must be treated as discrimination or retaliation claims. *Lynch v. Robertson*, Civil Action No. 3:2005-201, 430 WL 2407276, at *23, *25-27, 2007 U.S. Dist. LEXIS 60835, at *70, *75-83 (W.D. Pa. Aug. 20, 2007). Given the differing burdens imposed by the interference and discrimination regimes as discussed *infra*, the Court will reopen discovery to the extent necessary to address these differences, and as more fully set forth in the order that follows this opinion.

interference and discrimination claims have very different burdens of proof. To prevail on an interference claim, the employee need only show by a preponderance of the evidence "that he was entitled to benefits under the FMLA and that he was denied them." *Callison*, 430 F.3d at 119. This amounts to a strict liability standard. *Pinson v. Berkley Med. Res., Inc.*, Civil Action No. 03-1255, 2005 WL 3210950, at *14, 2005 U.S. Dist. LEXIS 13045, at *44 (W.D. Pa. June 21, 2005) (citing *Williams v. Shenango, Inc.*, 986 F.Supp. 309, 317-18 (W.D. Pa. 1997)).

By contrast, an employee's discrimination claim invokes the burden shifting scheme of either *Price Waterhouse v. Hopkins*, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989),[19] if there is direct evidence of discrimination or, if the evidence of discrimination is circumstantial, *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 688 (1973). *Hicks v. Tech Indus.*, 512 F.Supp.2d 338, 357 (W.D. Pa. 2007). In either case the employee must show that "(1) [he] availed [himself] of a protected right under the FMLA; (2) [he] was adversely affected by an employment decision; and (3) there is a causal connection between the employee's protected activity and the employer's adverse employment action." *Parker*, 234 F.Supp.2d at 488 (citing *Hodgens v. Gen. Dynamics Corp.*, 144 F.3d 151, 161 (1st Cir. 1998)); *see also Conoshenti*, 364 F.3d at 146.

Whether the absences for which Plaintiff claims FMLA protection were in fact so protected will be addressed *infra*. However, to the extent that they were protected there is ample direct evidence, in the form of Plaintiff's termination letter and Silka's testimony, that these absences were factors in Silka's decision to terminate Plaintiff. For purposes of the instant case, the Court will therefore examine only the *Price Waterhouse* regime.

---

[19] While Congress has overruled *Price Waterhouse* in the context of Title VII cases via the Civil Rights Act of 1991, 42 U.S.C. §§ 2000e-2, 2000e-5(f), "courts continue to use the . . . analysis in . . . non-Title VII discrimination cases." *Lackman v. Recovery Servs. of N. J.*, Inc., Civil Action No. 06-2016 (RMB), 2008 WL 583660, at *6 n.4, 2008 U.S. Dist. LEXIS *16 n.4 (D.N.J. Feb. 13, 2008).

Under *Price Waterhouse*, once the plaintiff has presented direct evidence that his leave "was a substantial factor in the decision to fire him, the burden of persuasion on the issue of causation shifts, and the employer must prove that it would have fired the plaintiff even if it had not considered [the FMLA] leave." *Conoshenti*, 364 F.3d at 147 (quoting *Fakete v. Aetna, Inc.*, 308 F.3d 335, 338 (3d Cir. 2002)). "This evidentiary scheme essentially requires the employer to place the employee in the same position he . . . would have occupied absent discrimination." *Id.* at 148 & n.11 (citing *Price Waterhouse*, 490 U.S. at 276-77, 109 S.Ct. 1775, 104 L.Ed.2d at 304-05). This approach is appropriate, since to hold otherwise "would contravene the plain language of the statute," which forbids using FMLA leave to place an employee in a better position *vis a vis* his employment than he would have been had he not taken leave. *Hicks*, 512 F.Supp.2d at 360 (citing 29 U.S.C. § 2614(a)(3)(B)).

Upon a showing of a violation of 29 U.S.C. § 2615 an employee is entitled to recover, in pertinent part, "any wages, salary, employment benefits, or other compensation" lost to the employee through the violation as well as interest on that amount "calculated at the prevailing rate." 29 U.S.C. § 2617(a)(1)(A)(i)(I), (a)(1)(A)(ii). The employee is also entitled to liquidated damages in an amount equal to the lost compensation and interest. 29 U.S.C. § 2617(a)(1)(A)(iii). There is, however, a partial affirmative defense, and if the employer "proves to the satisfaction of the court" that his violation of 29 U.S.C. § 2615 "was in good faith and that [he] had reasonable grounds for believing that his act or omission was not a violation of section 2615," the court may, at its discretion, forgive the liquidated damages portion of the award. *Id.*

## 1. Definitions of employer and employee under the FMLA

A municipality may be an employer under the FMLA. 29 U.S.C. §§ 203(x), 2611(4).

33

Defendants have stipulated that the City of Johnstown was Plaintiff's employer.[20] Document No. 48 p. 9. To be an eligible employee under the FMLA the employee must have been employed by the employer from whom he requested leave for at least twelve months before his request; must have worked for at least 1,250 hours for that employer during the preceding twelve months; and the employer must have employed at least 50 employees within 75 miles of the claimant's worksite. 29 U.S.C. § 2611(2). Defendants have also stipulated that Plaintiff was an eligible employee. Document No. 48 p. 9.

## 2. Serious health condition

Eligibility for leave under the FMLA in the case at bar is predicated on Plaintiff's absences having been caused by one or more serious health conditions. 29 U.S.C. § 2612(a)(1)(D). The existence of a serious health condition is a question of fact in the Third Circuit. *Victorelli*, 128 F.3d 184, 188 (3d Cir. 1997); *compare with Haefling v. United Parcel Serv., Inc.*, 169 F.3d 494, 499 (7th Cir. 1999) (holding that "[w]hether an illness . . . constitutes a 'serious health condition' under the FMLA is a legal question . . ."). The language of the statute suggests that "[t]he slings and arrows of everyday life, in Congress' view, should not be the stuff of a federal statute, nor federal litigation based on it" and that "Congress did not intend for an employee to stand on his or her FMLA rights whenever a need for aspirin or cold tablets arose." *Bond v. Abbott Labs.*, 7 F.Supp.2d 967, 973 (N.D. Ohio 1998) (quoting *Olsen v. Ohio Edison Co.*, 979 F.Supp. 1159, 1163 (N.D. Ohio 1997)). What Congress did intend, however, is less than precisely defined by the FMLA itself, *see* 29 U.S.C. § 2611; it is therefore necessary to turn to the federal regulations to determine whether something is a "serious health

---

[20] Whether the Defendants have agreed that Silka was an employer for purposes of the FMLA is not completely clear. The Court will address the matter later in this opinion, in conjunction with its analysis of Silka's claim of immunity. For purposes of the present discussion, the Court will use the term "Defendants" to refer to both Silka and the City.

34

condition."

There are, broadly, two types of serious health conditions. The first, in pertinent part, is "an illness, injury, impairment, or physical . . . condition that involves "an overnight stay [] in a hospital . . . including any period of incapacity (for purposes of this section, defined to mean inability to work . . .or perform other regular daily activities due to the serious health condition, treatment therefor or recovery therefrom), or any subsequent treatment in connection with such inpatient care." 29 C.F.R. § 825.114(a)(1). The second does not require an inpatient stay, but merely "[c]ontinuing treatment by a health care provider." 29 C.F.R. § 825.114(a)(2). "A serious health condition involving continuing treatment by a health care provider includes any one or more of the following":

(i) A period of incapacity . . . of more than three consecutive calendar days, and any subsequent treatment or period of incapacity relating to the same condition, that also involves:

> (A) Treatment two or more times by a health care provider, by a nurse or physician's assistant under direct supervision of a health care provider, or by a provider of health care services (e.g., physical therapist) under orders of, or on referral by, a health care provider; or
> (B) Treatment by a health care provider on at least one occasion which results in a regimen of continuing treatment under the supervision of the health care provider. . . .

(iii) Any period of incapacity or treatment for such incapacity due to a chronic serious health condition. A chronic serious health condition is one which:

> (A) Requires periodic visits for treatment by a health care provider, or by a nurse or physician's assistant under direct supervision of a health care provider;
> (B) Continues over an extended period of time (including recurring episodes of a single underlying condition); and
> (C) May cause episodic rather than a continuing period of incapacity (e.g., asthma, diabetes, epilepsy, etc.).

(iv) A period of incapacity which is permanent or long-term due to a condition for which treatment may not be effective. The employee . . . must be under the continuing supervision of, but need not be receiving active treatment by, a health care provider. .
. .

(v) Any period of absence to receive multiple treatments (including any period of recovery therefrom) by a health care provider . . . for a condition that would likely result in a period of incapacity of more than three consecutive calendar days in the absence

35

of medical treatment or intervention . . . .

29 C.F.R. § 825.114(a)(2).

Treatment "includes (but is not limited to) examinations to determine if a serious health condition exists and evaluations of the condition," but does not include routine physical, eye or dental examinations. 29 C.F.R. § 825.114(b). Continuing treatment involving over-the-counter medications "or bed-rest, drinking fluids, exercise and other similar activities that can be initiated without a visit to a health care provider" does not without more establish a regimen of continuing treatment for purposes of the FMLA. *Id.* "[U]nless complications arise, the common cold, the flu, ear aches, upset stomach, minor ulcers, headaches other than migraine, routine dental . . . problems [and] periodontal disease" are not considered to be serious health conditions for purposes of the FMLA. 29 C.F.R. § 825.114(c).

The rules for chronic health conditions are somewhat different. Absences due to a chronic health condition, so long as they are medically necessary, qualify for FMLA leave even if the employee does not receive treatment during the absence. 29 C.F.R. §§ 825.117, 825.114(e) (using as examples an asthma attack or an absence due to prior medical advice to remain home "when the pollen count exceeds a certain level"). Moreover, there are no durational requirements; an absence due to a chronic health condition need not last more than three days and may in fact be less than an hour. 29 C.F.R. §§ 825.114(e), 825.203(c), (d); *Victorelli*, 128 F.3d at 190 n.7; *Sabbrese v. Lowe's Home Ctr., Inc.*, 320 F.Supp.2d 311, 321-22 (W.D. Pa. 2004) (holding that a diabetic's "lunch break or any other type of break," when taken to allow the employee to eat for the purpose of maintaining his blood sugar level, qualified for FMLA leave).

### a. Syncopal episodes

#### (1) 29 C.F.R. § 825.114(a)(1)

It is undisputed that Plaintiff claims to have lost consciousness twice on September 5, 2003. It is also undisputed that he was admitted to the hospital the next day for evaluation of his alleged condition. Although Plaintiff now suggests that hypertension aggravated by hypokalemia could have caused his syncopal episodes, Document No. 15-2 p. 4, there is nothing in the record to indicate that any diagnosis resulted from the battery of tests to which Plaintiff was subjected, nor does the record show that he ever sought followup care for these episodes outside of his visit to the oral surgeon shortly after his termination.

Resolving all issues of credibility in favor of Plaintiff, as it must on Defendant's motion for summary judgment, the Court finds that a reasonable jury could conclude that Plaintiff had suffered from a physical condition involving an overnight stay in a hospital. In that event the plain language of 29 C.F.R. § 825.114(a)(1) would place the period of incapacity resulting from the September 5, 2003 syncopal episodes within the protections of the FMLA.[21]  *See Vallies v. Sky Bank,* 432 F.3d 493, 495 (3d Cir. 2006) (holding that "[i]t is well-settled that where unambiguous, the plain language of a statute or regulation controls"); *see also Reich v. Midwest Plastic Eng'g, Inc.* No. 1:94-CV-525, 1995 WL 478884, at *1, *8 ,1995 U.S. Dist. LEXIS 8772, at *2, *21 (W.D. Mich. June 6, 1995) (holding that hospitalization for chicken pox "sufficiently establish[ed]" that for the afflicted employee in that case chicken pox was a serious health condition for the entire course of the disease, including the period of

---

[21] The regulation encompasses "an illness . . . that involves . . . [i]npatient care . . . including *any* period of incapacity . . . or any *subsequent* treatment in connection with such inpatient care . . . ." 29 C.F.R. § 825.114(a)(1) (emphasis added). That the regulation limits covered treatment to the time following hospitalization but does not impose a similar limitation on the period of incapacity indicates that the period of incapacity may also precede the period of hospitalization.

illness preceding her hospitalization).

Indeed, the plain language of 29 C.F.R. § 825.114(a)(1) would encompass any periods of incapacity which the jury might find were engendered by the condition that resulted in Plaintiff's hospitalization. He must, however, offer something more than his own testimony as to his inability to work.[22] *Pinson*, 2005 WL 3210950, at *16, 2005 U.S. Dist. LEXIS 13045, at *47-48 (citing *Olsen*, 979 F.Supp. at 1166; *Brannon v. Ohkosh B'Gosh, Inc.*, 897 F.Supp. 1028, 1037 (M.D. Tenn. 1995)). *But see Marchisheck v. San Mateo County*, 199 F.3d 1068, 1074 (9th Cir. 1999) (holding that a patient's statement that he "did not and could not do anything for four or five days" was sufficient to "preclude[] summary judgment on the issue of 'incapacity'"). The Court finds, since a medical excuse is sufficient to show incapacity under the stringent demands of 29 C.F.R. § 825.114(a)(2)(i), *see McCoy v. Port Liberte Condo. Assoc. # 1, Inc.*, Civil Action No.: 2:02-1313, 2003 WL 23330682, at *5-6, 2003 U.S. Dist. LEXIS 26462, at *14-16 (D.N.J. Sept. 12, 2003); *Joslin v. Rockwell Int'l Corp.*, 8 F.Supp.2d 1158, 1160-61 (N.D. Iowa, 1998), that if at trial Plaintiff can link his August, 2003 periods of incapacity to his hospitalization the medical excuses he furnished for his absences of August 7, 21, 22 and 29 are sufficient to establish his incapacity on those dates.[23]

---

[22] The amount and nature of this additional evidence varies with the regulation under which the serious health condition is being defined. The Court is aware of no case that specifically addresses this requirement in terms of 29 C.F.R. § 825.114(a)(1). By far the greatest number of cases deal with 29 C.F.R. § 825.114(a)(2)(i), which requires a period of incapacity of "more than three consecutive calendar days"; nearly "all of the . . . courts that have addressed [the] issue" under this regulation have required a determination by a health care provider that the employee was unable to work because of his illness. *McCoy v. Port Liberte Condo. Assoc. #1, Inc.*, Civil Action No.: 2:02-1313, 2003 WL 23330682, at *5-6, 2003 U.S. Dist. LEXIS 26462, at *14-16 (D.N.J. Sept. 12, 2003) (collecting cases); *see also Yansick v. Temple Univ. Health Sys.*, Civil Action No. 04-4228, 2006 WL 2243178, at 13 n.26, 2006 U.S. Dist. LEXIS 53789, at * 42 n.26 (E.D. Pa. July 27, 2006) (holding that "[t]his inquiry is separate from the issue of medical certification" and is devoted to the determination of "whether any medical evidence shows that, at the time of Plaintiff's absence, the specified condition actually prevented him from working"). By contrast, and as will be more fully explored *infra*, the evidentiary requirements for a chronic condition are somewhat more relaxed. *See* 29 C.F.R. § 825.114(a)(2)(iii), (e); *McCoy*, 2003 WL 23330682, at * 7-9, 2003 U.S. Dist. LEXIS 26462, at *20-28.

[23] Plaintiff was also absent from work on August 1, 14 and 15, 2003. However, the only evidence in the record

38

In *Midwest Plastic* there was no dispute that the plaintiff had suffered from chicken pox. *Midwest Plastic*, 1995 WL 478884, at \*7-8 ,1995 U.S. Dist. LEXIS 8772, at \*20-22. By contrast, the cause of Plaintiff's syncopal episodes in the case *sub judice* was never diagnosed and Defendant has maintained from the outset that they never occurred. In light of the almost universal requirement that a plaintiff's self-serving representations by themselves are not enough to establish a serious health condition under the FMLA, the Court will not read 29 C.F.R. § 825.114(a)(1) to permit an employee to miss work, check himself into the hospital the next day, and without more automatically establish a serious health condition. The FMLA is intended to "balance the demands of the workplace with the needs of families . . . in a manner that accommodates the legitimate interests of employers," 29 U.S.C. § 2601(b), and such a holding would tilt the balance much too far in the employees' favor. Conversely, however, to ignore the possibility that a medical condition might warrant hospitalization even if it cannot be diagnosed and to therefore read into § 825.114(a)(1) a diagnosis requirement would tilt the statutory balance too far in the employer's direction. *See also Stekloff*, 218 F.3d at 863 (holding that FMLA eligibility is not predicated on diagnosis of a serious health condition); *Hodgens*, 144 F.3d at 163 (holding that Congress did not intend "to punish people who are unlucky enough to develop new diseases, or to suffer serious symptoms for some period of time before the medical profession is able to diagnose the cause of the problem"). The Court will therefore go to neither extreme, and instead merely require proof that the syncopal episodes actually occurred.[24]

---

that suggests an independent determination of his incapacity on August 1 is Plaintiff's testimony that he thought he had an excuse for that day but was "not sure." Document No. 46-4 p. 126. This is, without more, exactly the sort of "scintilla" of evidence that cannot defeat summary judgment. *See Anderson*, 477 U.S. at 251, 106 S.Ct. at 2511, 91 S.Ct. at 213. As for August 14 and 15, Plaintiff has never claimed that the ankle injury he identified as the cause of his absences on those dates was related to his unconsciousness and hospitalization, and the Court will not assume otherwise.

[24] The Court notes that Plaintiff's credibility regarding the syncopal episodes was the key issue for Defendants as well, and that Silka has admitted that he would not have disciplined Plaintiff for his September 5 absence if he had

The only evidence that Plaintiff was in fact unconscious for any part of September 5, 2003 is the testimony of Plaintiff and Kondash. When all issues of credibility are resolved against Plaintiff, as they must be on his motion for summary judgment, a rational jury could conclude that Plaintiff had never been unconscious on September 5. Whether Plaintiff has established the existence of a serious health condition under § 825.114(a)(1) finally comes down to whether Plaintiff and Kondash have told the truth. Issues of credibility and weight of the evidence belong to the jury; they are not matters to be decided by the Court on a motion for summary judgment. *Hill v. City of Scranton*, 411 F.3d 118, 131 (3d Cir. 2005) (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000)). It will therefore be up to the jury to determine whether Plaintiff suffered the syncopal episodes and, if so, whether they were etiologically related to any or all of Plaintiff's absences on August 7, 21, 22 and 29 of 2003.

## (2) 29 C.F.R. § 825.114(a)(2)(i)

Plaintiff also argues that his syncopal episodes and ensuing hospitalization established a serious health condition under 29 C.F.R. § 825.114(a)(2)(i). That regulation requires both "[a] period of incapacity . . . of more than three consecutive calendar days" and a subsequent period of treatment or incapacity "relating to the same condition" that involves either two or more treatments by a health care provider or at least one treatment by a healthcare provider "which results in a regimen of continuing treatment under [his] supervision . . . ." 29 C.F.R. § 825.114(a)(2)(i); *see also Schaub v. Fulton Precision Indus.*, No. Civ. A. 1CV-03-0980, 2005 WL 1154421, at *5 (M.D. Pa. May 4, 2005) (no LEXIS cite available). As discussed in n.21, *supra*, to establish a serious health condition under this

---

actually been unconscious. *See* Document No. 46-6 p. 26. The present inquiry would be far simpler for all concerned if Defendant had demanded medical certification at the time, rather than dismissing Plaintiff the day after he returned to work. However, as discussed *supra*, the Defendants' failure to demand certification does not foreclose their challenge to Plaintiff's account; they just must do so on a thinner record. *See Thorson*, 205 F.3d at 382.

regulation Plaintiff must first show, "based on a medical provider's assessment of the claimed condition," that he was incapacitated for more than three consecutive days because of his illness. *Olsen*, 979 F.Supp. at 1165-66 (citing *Brannon*, 897 F.Supp. at 1037; *Seidle v. Provident Mut. Life Ins. Co.*, 871 F.Supp. 238, 244 (E.D. Pa. 1994)) ; *see also Pinson*, 2005 WL 3210950, at *16, 2005 U.S. Dist. LEXIS 13045, at *47-48.

Plaintiff's medical excuse reads merely, "No work 9/8 due to health reasons." Document No. 47-9. Drawing all inferences in favor of Plaintiff, a reasonable jury could, however, conclude that an excuse for September 8 predicated on nothing more than a complaint of syncope on September 5 would encompass a period of incapacity lasting from at least the second syncopal episode on September 5 through September 8. Defendant argues that the regulatory requirement of "more than three consecutive calendar days" of incapacity mandates a four-day period which Plaintiff cannot satisfy. Were this case in another circuit, Defendant might be correct. *See Caldwell v. Holland of Texas, Inc.*, 208 F.3d 671, 676 (8th Cir. 2000) (citing *Hodgens*, 144 F.3d at 163); *Murray v. Red. Kap, Indus., Inc.*, 124 F.3d 695, 698 (5th Cir. 1997). However, the Court is not aware of any similar binding authority on the matter in the Third Circuit, and is therefore content and indeed required to take the meaning of § 825.114(a)(2)(i) at face value. *Burns v. Barnhart*, 312 F.3d 113, 125 (3d Cir. 2002) (holding that the Court "cannot ignore the plain wording of [a] regulation"). September 6, 7 and 8, 2003 constituted three consecutive calendar days; Plaintiff's period of claimed unconsciousness on September 5 was both consecutive and in addition to the three-calendar-day period; the resulting period therefore meets the durational requirement of the regulation.

Plaintiff must still, however, satisfy one of the treatment prongs of § 825.114(a)(2)(i). He attempts to do so by arguing that Plaintiff was treated "on more than two occasions" while hospitalized.

41

Document No. 47 p. 19. The regulation, however, requires that the treatment be subsequent to rather than contemporaneous with the period of incapacity.[25] Although Plaintiff points to an order for a carotid artery ultrasound and a followup appointment with Dr. Wisniewski, Plaintiff neither had the ultrasound nor kept the appointment. The Court finds as a matter of law that Plaintiff has not established that his episodes of syncope constituted a serious health condition under 29 C.F.R. § 825.114(a)(2)(i).[26]

### b. Ankle injury

Plaintiff was never admitted to the hospital for his ankle injury as required by 29 C.F.R. § 825.114(a)(1). He has not alleged that the injury created a chronic condition as required by 29 C.F.R. § 825.114(a)(2)(iii) or that his period of incapacity from the injury was permanent or long-term as required by 29 C.F.R. § 825.114(a)(2)(iv). He has also not alleged that had he not received treatment for his ankle he would likely have been incapacitated for more than three consecutive days or that he received multiple treatments; both are required by 29 C.F.R. § 825.114(a)(2)(v).

Plaintiff has given no evidence that a health care provider determined that he was incapacitated by his ankle injury for more than three consecutive days as required by 29 C.F.R. § 825.114(a)(2)(i). Even if he had, he only saw a doctor about his ankle once and not the "two or more times" mandated by 29 C.F.R. § 825.114(a)(2)(i)(A). Plaintiff's single visit to the doctor does suffice for 29 C.F.R. § 825.114(a)(2)(i)(B), but that section also requires "a regimen of continuing treatment under the

---

[25] The Court notes in passing that the fact that Plaintiff was terminated shortly after his final absence does not obviate the regulation's subsequent treatment requirement. *Schaub*, 2005 WL 11544211, at *5 (no LEXIS cite).

[26] Since Plaintiff cannot establish a serious health condition under § 825.114(a)(2)(i), the Court need not consider whether Plaintiff's absences prior to September 5, 2003 were also protected under that section. *See Hodgens*, 144 F.3d at 163 (holding that a showing of incapacity of more than three consecutive days is sufficient to afford FMLA protection to etiologically related prior absences of shorter duration); *see also Caldwell*, 208 F.3d at 676 (citing *Hodgens*, 144 F.3d at 163).

42

supervision of the health care provider." Such a regimen may include "a course of prescription medication" such as an antibiotic, or "therapy requiring special equipment to resolve or alleviate the health condition." 29 C.F.R. § 825.114(b). Plaintiff had neither, but instead only an order from his doctor for an x-ray which was never taken.

Since Plaintiff's ankle injury meets none of the regulatory definitions of a serious health condition in 29 C.F.R. § 825.114, Plaintiff's absences on August 14 and 15 of 2003 are outside the protection of the FMLA. The Court therefore finds for Defendant on its motion for summary judgment regarding these two absences.

### c. Chronic condition, 29 C.F.R. § 825.114(a)(2)(iii)

To establish the presence of a chronic health condition, Plaintiff must show that it (1) requires periodic visits to his health care provider for treatment, which may include "examinations to determine if a serious health condition exists and evaluations of the condition" and (2) "[c]ontinues over an extended period of time."[27] 29 C.F.R. § 825.114(a)(2)(iii), (b). His high blood pressure certainly qualifies; he has been diagnosed since at least 2001, visits his cardiologist once or twice a year for followup evaluations, and takes prescription medications to control it. *See Oswalt v. Sara Lee Corp.*, 74 F.3d 91, 93 (5th Cir. 1996) (holding that since high blood pressure involved continuing treatment it "could be considered a 'serious health condition'"). Similarly, on his cardiologist's orders Plaintiff

---

[27] Defendants' protestations to the contrary notwithstanding, Plaintiff does not, however, have to show that any of his conditions are incurable. To the extent that the case Defendants cite, *Prince v. Howmet Corp.*, Civil Action No. 03-5434, 2005 WL 1106548, at *13, 2005 U.S. Dist. LEXIS 16035, at *36 (D.N.J. Apr.29, 2005), holds otherwise, it has misread the present regulations. It seems likely that the cited passage in *Prince* is based on interim final regulation 29 C.F.R. § 825.114(b)(3), which defines a serious health condition as "[c]ontinuing treatment by . . . a health care provider for a chronic . . . health condition that is incurable or so serious that, if not treated, would likely result in a period of incapacity of more than three calendar days . . . ." *See Seidle*, 871 F.Supp. at 243. This interim final regulation was supplanted in 1995 by 29 C.F.R. § 825.114(a)(2)(iii), (iv) and (v). *See Victorelli*, 128 F.3d at 188-89 (analyzing a claim under both the interim final rules and the final rules). The present § 825.114(a)(2)(iii) merely requires that the condition be chronic; it need not also be incurable.

43

has been taking over-the-counter potassium supplements for his hypokalemia since 2001 and his doctors periodically order blood work to, *inter alia*, check his serum potassium levels. [28]

Plaintiff's claims of chronic sinusitis are more problematic. He states that he has suffered from the condition since 1999, yet Defendant avers that Plaintiff's medical records "do not indicate that he was ever evaluated and/or treated for sinus infection." Document No. 47-13 p. 6 ¶ 6. Plaintiff's contrary testimony that he has taken prescription antibiotics for some time for sinus infections and Kimberly Wisniewski's note to her file from September 2, 2003 stating that Plaintiff had just obtained his second medical excuse in two weeks for a sinus headache are sufficient, albeit barely, to create an issue of fact as to the existence, duration and periodic treatment of Plaintiff's sinusitis.[29]

A reasonable jury could certainly conclude from the record of Plaintiff's multiple tooth extractions by an oral surgeon and claimed monthly visits to his regular dentist in 2003 for fillings and bonding that he suffered from chronically bad teeth. However, 29 C.F.R § 825.114(c) specifically excludes "routine dental . . . problems" and periodontal disease from the definition of a serious health condition "unless complications arise." *Davis v. Boise Cascade Corp.*, No. Civ. 03-06081 MJRDRLE,

---

[28] The Court notes that while the use of an over-the-counter medication without more is "[in]sufficient to constitute a regimen of continuing treatment," § 825.114(b), Plaintiff took the potassium supplements under a doctor's supervision and subject to regular monitoring of the results. That is enough for the Court to distinguish Plaintiff's treatment for hypokalemia from the "take two aspirin and call me in the morning" mode of therapy that is disallowed by the regulation.

[29] So far as the Court can determine, there are only two cases in the federal system to have considered whether sinusitis is a serious health condition, and both held that it is not. *See Beaver v. RGIS Inventory Specialists, Inc.*, 144 Fed.Appx. 452, 455-56 (6th Cir. 2005); *Hastings v. Carlson Mktg. Group, Inc.*, Civil No. 04-3370 (DWF/JSM), 2005 U.S. Dist. LEXIS 25808, at *18 (D. Minn. Oct. 27, 2005) (no Westlaw cite available). The two cases are, however, distinguishable from Plaintiff's since they dealt with acute sinusitis, characterized as a "routine, short-term illness[]," rather than the chronic sinusitis Plaintiff claims. *Beaver*, 144 Fed.Appx. at 455-56; *Hastings*, 2005 U.S. Dist. LEXIS, at *17-18; *see also* 29 C.F.R. § 825.114(c) (excluding such illnesses as the common cold and the flu, illnesses similar in duration and effect to acute sinusitis, from the definition of serious health condition). The Court also notes that the regulations do not absolutely preclude even a "minor" complaint from being found, under the circumstances of a particular case, to be a serious medical condition. *Thorson*, 205 F.3d at 380.

2005 WL 1324017, at * 5 (D. Minn. June 3, 2005) (no LEXIS Cite available); *Bond*, 7 F.Supp.2d at 974-75. Plaintiff has offered no evidence that his tooth and gum problems were other than routine, and the Court will not assume otherwise. *Cf. Davis*, 2005 WL 1324017, at *10 (no LEXIS cite available) (finding that Davis's dental condition was a serious health condition based on his oral surgeon's"unrebutted testimony that [Davis's] condition was not routine").

There is, however, no reason that each of Plaintiff's maladies must be analyzed in isolation. The seriousness of an individual's impairment "is related to the cumulative impacts of illness on [the person's] body and mind" and therefore "several diagnoses, if temporally linked" can "constitute a serious health condition" even if no single disease would rise to that level. *Price v. City of Fort Wayne*, 117 F.3d 1022, 1023, 1025 (7th Cir. 1997); *see also Caldwell*, 208 F.3d at 676 (holding that "diseases do not afflict people in methodical and predictable ways: certain serious diseases can elude diagnosis, change in severity, and have cumulative effects on the body over time"). Indeed, as noted above the diagnosis of a serious medical condition is not an absolute prerequisite to eligibility for leave under the FMLA. *Stekloff*, 218 F.3d at 863. Such a diagnosis could be particularly difficult in cases involving a chronic health condition, and an employee should not be denied benefits under the FMLA because his doctors were not able "to draw a connection between incidents of [suffering] before the sick party's employment [was] terminated . . . ." *McCoy*, 2003 WL 23330682, at *8, 2003 U.S. Dist. LEXIS 26462, at *26.

The establishment of a chronic condition is not, however, enough by itself to bring its sufferer within the ambit of the FMLA. He must also show incapacity. 29 C.F.R. § 825.114(a)(2)(iii). To the extent that Plaintiff's conditions could be treated medically, as suggested by Defendant's expert, Document No. 47-13 p. 7, the availability of even generally effective treatment does not obviate the

45

FMLA's protections. *Victorelli*, 128 F.3d at 190. To the contrary, many serious health conditions, "as long as they are being treated, do not impede a person's ability to work," and "Congress did not intend to deny FMLA protection to an employee simply because [his] doctor was able to mitigate the frequency of [his] discomfort or incapacity." *Id.* Moreover, in cases of episodic incapacity "staying home and self-treatment are often more effective that visiting the health care provider," and an employee may qualify for FMLA leave "even though . . . he does not receive treatment from a health care provider during [his] absence . . . ." 29 C.F.R. § 825.114(e); *Victorelli*, 128 F.3d at 190 n.7 (citing 60 Fed. Reg. 2180 at 2195).

Defendants cite *Pinson*, 2005 WL 3210950, at *16, 2005 U.S. Dist. LEXIS 13045, at *48, for the proposition that "an FMLA plaintiff must demonstrate that 'a health provider made a professional assessment of [plaintiff's] condition and determined, based on that assessment, that an extended absence from work was necessary.'" Document No. 43 p. 18. Defendants are correct that "a showing of *some* incapacity [is required] in the context of claims under 29 C.F.R. § 825.114(a)(2)(iii)." *McCoy*, 2003 WL 23330682, at *7, 2003 U.S.. Dist. LEXIS 26462, at *20 (citations omitted) (emphasis in original). However, by neglecting to mention that *Pinson* was quoting another case that deals with the more stringent requirements for establishing an extended period of incapacity under 29 C.F.R. § 825.114(a)(2)(i), Defendant has suggested a level of proof greater than that required by § 825.114(a)(2)(iii). *See Pinson*, 2005 WL 3210950, at *16, 2005 U.S. Dist. LEXIS 13045, at *48 (quoting *Olsen*, 979 F.Supp. at 1166); *Olsen*, 979 F.Supp. at 1165; *see also* 29 C.F.R. § 825,114(a)(2)(iii)(C), (e) (indicating that the regulations defining a chronic health condition contemplate an "episodic rather than a continuing period of incapacity" and that these periods of episodic incapacity have no minimum duration).

46

Defendants have also neglected to mention that *Pinson* went on to find that doctors' excuses and a doctor's testimony regarding continuing treatment, when added to Pinson's testimony, were enough to establish a material issue of fact regarding her eligibility for FMLA leave for a chronic condition. *See Pinson*, 2005 WL 3210950, at \*16, 2005 U.S. Dist. LEXIS 13045, at \*48-49. Although Plaintiff has not provided the same level of medical testimony, he has provided medical excuses for his absences of August 7, 21, 22 and 29. Since there is no requirement that his condition or conditions be diagnosed or that they be treated by a health care provider during these absences, the Court finds that Plaintiff has, again barely, established an issue of material fact as to his eligibility for FMLA leave on August 7, 21, 22 and 29 of 2003 under 29 C.F.R. § 825,114(a)(2)(iii). As the Court has already found that the record could support a reasonable jury's conclusion that at least Plaintiff's second syncopal episode and his resulting absence from work were encompassed by his medical excuse for September 8, 2003, the jury may also consider whether Plaintiff's September 5 absence was due to a chronic serious health condition.

## 3. Notice

Issues of notice are mixed questions of fact and law, where the factfinder "determine[s] the facts of the notice given" while the Court "determine[s] whether those facts are sufficient reasonably to give an employer notice as required by the FMLA." *Cavin*, 346 F.3d at 723; *see also Sarnowski*, 510 F.3d at 403 (holding that disputes over "the precise content of the notice given" must be resolved by the trier of fact but that the ultimate determination is whether the employee "gave legally sufficient notice . . ."). *But see Burnett*, 472 F.3d at 479 n.4 (suggesting that "[b]ecause adequacy of notice is a fact-rich question, it is perhaps best resolved by the trier of fact . . ."). At the notice stage, the employee does not have to prove that he is entitled to leave; he merely needs, as the Seventh Circuit puts it, to establish

47

"probable cause" for his entitlement. *Burnett*, 472 F.3d at 480 (citing *Aubuchon*, 359 F.3d at 953). This limited requirement is consistent with the FMLA and its accompanying regulations, since to require more would be to render the interlocking obligations of the FMLA a nullity by obviating the employer's duty to inquire further once the employee has given sufficient notice. *See Peter*, 255 F.Supp.2d at 441; *Barnett*, 67 F.Supp.2d at 385-86.

## a. For intermittent absences

Regardless of whether Plaintiff suffered from one or more serious health conditions, for Plaintiff to invoke the protections of the FMLA for an absence for which he did not give advance notice he must show that he advised Defendant "within two business days of returning to work of the reason for the leave." 29 C.F.R. § 825.208(e)(1). Plaintiff cannot make such a showing regarding his August 1, 2003 absence, since he cannot recall whether he ever offered any explanation, let alone point to any evidence that he did. The Court therefore finds, as a matter of law, that Plaintiff did not give Defendant sufficient notice to invoke the protections of the FMLA for the August 1 absence.

By contrast, there is substantial evidence in the record to indicate that Plaintiff informed Andrews and Davis on August 8, 2003 that he "had a sinus issue" that had caused his August 7, 2003 absence.[30] There remains, however, a question of fact as to whether Plaintiff's claim of a sinus issue was sufficient to apprise Defendant of Plaintiff's need to have taken leave "for a serious health condition that rendered him unable to perform his job." *Sarnowski*, 510 F.3d at 402 (citing *Brenneman v. MedCentral Health Sys.*, 366 F.3d 412, 421 (6th Cir. 2004); *Manuel*, 66 F.3d at 764)); *see also Cavin*, 346 F.3d at 723-24. As an initial matter, notwithstanding Plaintiff's arguments to the contrary the

---

[30] It was not necessary for Plaintiff to notify Silka directly; Andrews was Plaintiff's immediate supervisor and for purposes of the FMLA a supervisor's knowledge is imputed to the employer. *Cavin*, 346 F.3d at 726 n.9 (citation omitted).

48

record does not establish exactly what was said at the meeting. More generally, in analyzing whether an employee's statement provided his employer with sufficient notice, the statement must be viewed in the context of the employer's knowledge of the employee's condition. *See Burnett*, 472 F.3d at 480-81 (holding that an employee's statement that he was "sick" and "wanted to go home," when his employer had sufficient information to indicate that the employee may have been suffering from prostate cancer was sufficient notice for FMLA protection); *Spangler*, 278 F.3d at 852-53 (holding that the employee's statement "depression again" was sufficient notice where she had "informed several supervisors of her illness" during her period of employment).[31]

It is undisputed that Andrews knew of Plaintiff's high blood pressure and that Plaintiff had trouble with blurry vision well before August 8, 2003. Andrews may also have been aware of Plaintiff's claimed sinus problems before August 8. While there is more than enough information in the record to preclude summary judgment for Defendant on the matter of notice, it will be necessary for the jury to establish both what information Plaintiff gave Defendants on August 8, 2003, and what Defendants knew about Plaintiff's condition prior to that date.

Plaintiff's August 25, 2003 medical excuse for his absences of August 21 and 22 was timely, but merely said "medical problems." Even assuming that Defendants were fully versed in Plaintiff's complaints and medical history by that time, the excuse "[did] not imply 'a serious health condition'" and therefore failed to provide Defendant with adequate notice. *Collins*, 272 F.3d at 1008; *see also*

---

[31] The holding in *Burnett* is at the outer limits of the liberal use of context to establish notice. The other extreme is illustrated by *Brenneman*, which found as a matter of law that an employee's statement that "he was having a problem with his insulin pump" was not sufficient notice since the "'problem' might have been of a mechanical or minor nature that would not have affected the pump's effectiveness or plaintiff's health." *Brenneman*, 366 F.3d at 428-29. *Spangler* in turn stakes out the broad middle ground. *See also Collins*, 272 F.3d at 1008-09. The Court need not determine at present precisely how it will assess Plaintiff's notice in the instant case since the analysis will, as discussed *infra*, be based on facts that have yet to be determined.

49

*Brenneman*, 366 F.3d at 423 n.9 (holding that where plaintiff had "a long history of diverse physical maladies" and his employer knew that he suffered from diabetes, merely saying that he was "ill" or "not feeling well [while] experiencing a diabetes-related illness" did not give employer adequate notice under the FMLA); *cf. Spangler*, 278 F.3d at 852-53 (finding adequate notice where employer was already aware of employee's condition and employee specifically referred to the condition); *Collins*, 272 F.3d at 1008-09 (holding that employee may give adequate notice by merely referring to a serious health condition of which employer is already aware). Plaintiff could possibly have cured the deficiency by providing Andrews with a more detailed explanation. Instead, all he can aver is that he "probably mentioned it was sinus again" but could not recall whether or to whom he might have done so. As a matter of law, the Court finds that Plaintiff provided Defendant with insufficient notice regarding his August 21 and 22, 2003 absences.[32]

Plaintiff also offered a timely medical excuse for his August 29, 2003 absence, but again there is nothing in the record regarding its contents  However, Silka conducted a "due process hearing" regarding Plaintiff's absences on September 4, 2003, within the requisite two business days of Plaintiff's return to work on September 2. At this hearing Plaintiff presented Silka with a letter stating that at Plaintiff's next doctor's appointment his doctor was going to decide whether Plaintiff needed surgery to address the "source of [his] health problems." Document No. 47-11 p.5. In addition, Plaintiff stated that his absentee pattern on Thursdays and Fridays was "due to his sinus and blood pressure conditions that [left] him exhausted by Thursday." *Id.* at 2-3, 5. The Court finds as a matter

---

[32] Although it is not completely clear to the Court, Plaintiff appears to cite *Williams*, 986 F.Supp. at 319-20 for the proposition that inadequate notice that could have been cured if the employer had acted as if it had received adequate notice and "inquired further and explained the circumstances under which FMLA leave is appropriate" is therefore adequate notice in the first instance. To the extent that this is the holding of *Williams*, the Court notes that it is a relatively early case in the history of the FMLA and, as discussed at length above, more than a decade of subsequent jurisprudence has established that, in fact, only adequate notice is adequate notice.

of law that these notices gave Defendant enough information for it to have reasonably concluded that Plaintiff was suffering from one or more serious health conditions and that therefore Plaintiff met his notice requirement for the August 29 absence.

Silka conducted a second due process on September 9, 2003, the day of Plaintiff's return to work after the syncopal episodes of September 5. It is undisputed that at this hearing Plaintiff described both the periods of unconsciousness and his hospitalization. The Court finds as a matter of law that Plaintiff once again furnished Defendant with sufficient information for it to reasonably conclude that Plaintiff's September 5 absence had been the result of a serious health condition.[33]

### b. Prospective leave

Plaintiff argues that Defendant should have offered him intermittent leave to accommodate his inability to work a full week. Although it is not completely clear to the Court, Plaintiff also may be arguing that Defendant should have offered him FMLA leave in 2003 for the surgery mentioned at the September 4 hearing, or to simply rest up and attempt to recover from his multiple ailments. The Third Circuit has recently held that "in order to benefit from the protections of the [FMLA], an employee must provide his employer with enough information to show that he *may* need FMLA leave." *Sarnowski*, 510 F.3d at 402-03 (quoting *Woods*, 409 F.3d at 990) (emphasis added in *Sarnowski*). The Court has already found as a matter of law that Plaintiff showed "probable cause" that he suffered from serious health conditions at the due process hearings on September 4 and 9, 2003.[34] Since Plaintiff had

---

[33] The Court notes that Plaintiff's girlfriend, in an apparent attempt at compliance with 29 C.F.R. § 825.303, left a message for Davis on either September 6 or 7, 2003. However, the contents of the message remain an issue of fact. Since, though, the record of the September 9 due process hearing is dispositive on the issue of the September 5 notice requirement the question of the contents of the girlfriend's message is not material to the case and therefore need not be submitted to the jury.

[34] Whether either the high blood pressure/sinus condition or the syncope condition were in fact serious health conditions and, if so, whether they were etiologically related remains an issue of material fact to be determined by the jury.

51

given notice of a serious health condition or conditions that had ostensibly caused previous absences, and since there was no evidence that the condition or conditions had been ameliorated in any way, the Court finds that Plaintiff also gave Defendant sufficient information at the September 4 and 9 hearings to provide notice that he might require intermittent FMLA leave in the future. By the same reasoning, depending on the precise findings of the jury as to the contents off Plaintiff's August 8 notice of the reasons for his August 7 absence, Plaintiff may have established sufficient notice of his possible need for future intermittent leave at that time.

When requesting planned leave, including leave for surgery, an employee must also provide the employer with the "anticipated timing and duration of the leave." 29 C.F.R. § 825.302(c). An employee may, however, " provide FMLA qualifying notice before knowing the exact dates or duration of the leave [he] will take" and, in fact, such early notice is encouraged to "maximize[] employers' ability to plan their staffing needs." *Sarnowski*, 510 F.3d at 403; *see also* 29 U.S.C. § 2612(e)(2)(A). The Third Circuit has found sufficient notice for purposes of the FMLA where the employee advised his employer that "he would have to undergo medical monitoring, and that he might need to take an additional six weeks off for further heart surgery" but the employee was terminated "before he had learned that the need for surgery was definite." *Sarnowski*, 510 F.3d at 400. Although Plaintiff did not provide a possible duration of his absence he, like Sarnowski, did alert his employer to the possibility that he might need surgery. Given what he knew at the time he did all he could, and it was enough for the Court to find that he provided Defendant with legally sufficient notice for purposes of the FMLA.

As for the possibility of an extended leave for purposes of rest and recovery, there is nothing in the record that even suggests that Plaintiff indicated to Defendant that he sought such a period or that such a period would have promoted his recovery from what were, after all, chronic rather than

52

acute conditions. Although Plaintiff's burden at the notice stage is low, he must give his employer enough information to allow it to conclude that he is in fact seeking leave; "[t]he FMLA does not require an employer to be clairvoyant." *Brenneman*, 366 F.3d at 428. The Court finds that the record, even when viewed in the light most favorable to Plaintiff, does not demonstrate legally sufficient notice of Plaintiff's desire to take a purely recuperative leave.

## 3. Causes of action

### a. Interference

Plaintiff argues that Defendant interfered with his rights under the FMLA by (1) failing to offer him unpaid leave after he provided notice of his possible need for such leave; (2) failing to advise him of his right to time off under the FMLA; (3) requiring a doctor's excuse for every absence instead of abiding by the strictures of 29 C.F.R. § 825.308(a), which allow an employer to require medical certification "no more often than every 30 days"; (4) firing him instead of granting him leave to which he was entitled; and (5) refusing to grant him FMLA leave and reinstatement after his termination. As discussed above, an action alleging termination for the exercise of rights granted by the FMLA is treated in the Third Circuit as a case of discrimination.[35] It is undisputed that Plaintiff took leave. If he qualified for the leave under the FMLA he was simply exercising his rights under the Act; if he did not qualify he had no rights to exercise and cannot prevail under any theory involving the FMLA. The Court will therefore analyze Plaintiff's wrongful termination claim as one of discrimination rather than interference.

---

[35] The Third Circuit has recently treated termination in the face of an employee's unrealized *intention* to exercise a right granted by the FMLA as interference. *Sarnowski*, 510 F.3d at 403. However, the Court then went on to hold that Sarnowski could "not prevail on his interference claim if [his employer could] establish that it terminated [him] for a reason unrelated to his intention to exercise his rights under the FMLA," *id.* at 403, thereby treating this putative interference claim just like any other discrimination or retaliation claim subject to *Price Waterhouse* analysis. *See Conoshenti*, 364 F.3d at 147-48.

As for Plaintiff's other interference claims, the elements are as follows:

(1) [Plaintiff] is an eligible employee under the FMLA, (2) defendant is an employer subject to the requirements of the FMLA, (3) [Plaintiff] was entitled to leave under the FMLA, (4) [Plaintiff] gave notice to the defendant of [his] intention to take FMLA leave, and (5) the defendant denied [Plaintiff] the benefits to which [he] was entitled under the FMLA.

*Parker*, 234 F.Supp.2d at 483.

The parties agree that Plaintiff was employed for a sufficient number of hours to render him an eligible employee for purposes of the FMLA and that the City is an employer subject to the requirements of the Act.[36] Entitlement to leave is predicated on the establishment of incapacity due to a serious health condition; the Court has fully explored that issue and the question of notice *supra*. Whether Plaintiff was denied any benefits to which he was entitled depends, initially, on a showing of entitlement, as established by satisfaction of the other four elements.

Turning to Plaintiff's post-termination interference claim, the Court notes that it is impossible to interfere with what does not exist. Plaintiff made his request for reinstatement and FMLA leave on October 10, 2003, exactly one month after his employment ended. However, to be an eligible employee under the Act, a person must first be employed by the employer against whom he seeks to assert the right. *See* 29 U.S.C. § 2611(2)(A), (3). On October 10, 2003 Plaintiff was not employed by the City; was therefore not an eligible employee for purposes of the Act; and therefore had no FMLA rights with which Defendants could interfere. To whatever extent Defendants may have violated Plaintiff's rights under the FMLA, those violations ended with his termination on September 10, 2003.

Even apart from the logical problems inherent in an ex-employee's assertion of a right only available to employees, Plaintiff would not be entitled to reinstatement after an FMLA leave unless he

---

[36] Silka's status as employer will be discussed *infra*.

could perform the essential functions of his position. *Rinehimer v. Cemcolift, Inc.*, 292 F.3d 375, 384 (3d Cir. 2002) (citing 29 C.F.R. § 825.214(b) (2001)); *Reynolds v. Phillips & Temro Indus., Inc.*, 195 F.3d 411, 414 (8th Cir. 1999); *Tardie v. Rehab. Hosp. of R.I.*, 168 F.3d 538, 543 (1st Cir. 1999)); *see also Spangler*, 278 F.3d at 853 (citing *Collins*, 272 F.3d at 1007); *Chapman v. UPMC Health Sys.*, 516 F.Supp.2d 506, 521 (W.D. Pa. 2007); *Reifer v. Colonial Intermediate Unit 20*, 462 F.Supp.2d 621, 636-37 (M.D. Pa. 2006). The record indicates that an essential function of Plaintiff's position was that he be able to work a full week, and that the ability to work on Fridays was especially important.[37] Plaintiff's entire case, however, is grounded on the argument that he suffered from longstanding chronic conditions that prevented him from working full weeks and especially Fridays on a regular basis.

On its face, Plaintiff's argument precludes reinstatement. Plaintiff has, however, argued that even though he could not reliably perform an essential function of his job for the two years leading up to his termination, and even though the only treatment he underwent after his termination was the extraction of several infected teeth, he was as of October 10, 2003 fit for service. Since his claim of fitness does not conflict with Defendant's position that Plaintiff was never incapacitated due to a serious health condition, Plaintiff's ability to perform the essential functions of his job post-termination, and hence his entitlement to reinstatement, will be a question for the jury should the case progress to the remedies stage.

Interference includes the refusal to authorize FMLA leave "as well as discouraging an employee from using such leave." 29 C.F.R. § 825.220(b). It also includes an employer's failure to advise an

---

[37] The Court is aware of one case that exempted the ability "to work a full-time schedule" from the list of essential job functions for purposes of establishing a right to reinstatement under the FMLA. *See Hatchett v. Philander Smith Coll.*, 251 F.3d 670, 676 (8th Cir. 2001). However, this holding was subsequently overruled by *Spangler*. which held that the FMLA did not give an employee the right to "take unscheduled and unpredictable, but cumulatively substantial, absences." *Spangler*, 278 F.3d at 853 (quoting *Collins*, 272 F.3d at 1007).

employee of his rights under the Act, *Conoshenti*, 364 F.3d at 143,[38] and the imposition of conditions for eligibility for FMLA leave in addition to those dictated by the FMLA itself. *See Callison*, 430 F.3d at 120-21. Since the record is clear that Defendant never so much as contemplated offering Plaintiff FMLA leave, Defendant's insistence that Plaintiff obtain a doctor's excuse after every absence was neither a precondition for nor an impediment to Plaintiff obtaining leave under the FMLA. There was therefore no interference and hence no violation; that claim must fail.

Even proof of a violation is not by itself enough to allow recovery under the FMLA; the Act provides "no relief unless the employee has been prejudiced by the violation." *Ragsdale*, 535 U.S. at 89, 122 S.Ct. at 1161, 152 L.Ed.2d at 176; *see also Conoshenti*, 364 F.3d at 143; *Cavin*, 346 F.3d at 726 (citing *Ragsdale*, 535 U.S. at 89-90, 122 S.Ct. at 1161, 152 L.Ed.2d at 167). The harms contemplated by the Act are revealed in the language of 29 U.S.C. § 2617(a), which allows recovery only for lost compensation and other monetary losses due to the violation, as well as appropriate equitable relief "including employment, reinstatement, and promotion." *See also Ragsdale*, 535 U.S. at 89, 122 S.Ct. at 1161, 152 L.Ed.2d at 176.

Plaintiff argues that had Defendant offered him FMLA leave or advised him that he had the right to take such leave for his various ailments he would have availed himself of that right on September 5, 2003. Viewing the facts in the light most favorable to Plaintiff, a reasonable jury could agree. However, Plaintiff has already invoked the FMLA to justify his absence on that date and has

---

[38] *Conoshenti* dealt with the employer's duty to advise that was triggered by an employee's notice of a serious health condition. *Conoshenti*, 364 F.3d at 142. This is wholly distinct from the requirement of 29 U.S.C. § 2619 that an employer post "a notice . . . setting forth excerpts from, or summaries of, the pertinent provisions" of the FMLA and "it is well settled that an employee has no private right of action" where an employer has failed to post the notice. *Deily v. Waste Mgmt. of Allentown*, 118 F.Supp.2d 539, 544 (E.D. Pa. 2000). The Court notes that failure to post does, however, prevent an employer from taking "any adverse action against an employee . . . for failure to furnish the employer with advance notice of a need to take FMLA leave." 29 C.F.R. § 825.300(b). This provision is irrelevant in the instant case as Plaintiff's absences in August and September of 2003 were allegedly unforeseeable, and advance notice was therefore not possible. See 29 C.F.R. § 825.303.

already established that he gave Defendant sufficient notice to implicate the Act at the September 9 due process hearing. If Plaintiff can establish that his absence on September 5 was due to a serious health condition that absence cannot be used by Defendant to justify his termination in any event. *Conoshenti*, 364 F.3d at 148 & n.11. Moreover, Plaintiff can show no lost compensation. To the contrary, he may have been somewhat better off as there is nothing in the record to indicate that he was not paid for September 5 but, since he had run out of paid sick days, he would not have been paid had he taken FMLA leave.[39] Finally, Plaintiff has pointed to no out-of-pocket expenses incurred as a result of his not taking leave on September 5. Given the remedial scheme of the statute, he has failed to show any prejudice under a theory of either failure to advise or failure to offer intermittent leave and therefore those claims must also fail.

To the extent that Plaintiff has argued that he should have been either offered leave or advised of his rights to leave for the surgery mentioned at the September 4 due process hearing, the necessity of the surgery had not been determined as of September 4 and Plaintiff was terminated before his next doctor's appointment. In contrast to *Sarnowski*, in which, if there had been any violation of the FMLA, it could only have been the employee's termination after informing his employer of his potential need for surgery, *Sarnowski*, 510 F.3d at 400, 403, there is nothing in the record to suggest that Plaintiff was fired to prevent him from exercising any rights he may have had to leave for the surgery, nor has he expressly argued that he was. Once again, Plaintiff cannot show prejudice and this claim must fail as well.

---

[39] The Court notes that Plaintiff did not work on September 8 and therefore was presumably not paid for that day. However, there is no way to determine from the record whether Plaintiff would have been able to work on September 8 if he had taken leave and, in any event, none of the parties have raised the issue.

57

### b. Discrimination/retaliation

As discussed above, to establish a claim of discrimination Plaintiff must show that "(1) [he] availed [himself] of a protected right under the FMLA; (2) [he] was adversely affected by an employment decision; and (3) there is a causal connection between the employee's protected activity and the employer's adverse employment action." *Parker*, 234 F.Supp.2d at 488 (citing *Hodgens*, 144 F.3d at 161); *see also Conoshenti*, 364 F.3d at 146. The Court has found as a matter of law that Plaintiff's absences of August 1, 14, 15, 21 and 22 did not qualify for leave under the FMLA. The jury will have to determine if his absences of August 7 , August 29 and September 5 were protected by the Act. There is no question that Plaintiff's termination was an adverse employment action. There is also no question that the absences of August 7 , August 29 and September 5 were all factors in Plaintiff's firing. They are identified as such in his termination letter and, moreover, Silka has testified that any one of the potentially protected absences could have provided sufficient ground by itself for Plaintiff's termination.

Since there is direct evidence of the causal connection between Plaintiff's arguably protected absences and his termination, if the jury finds that any or all of his absences on August 7, August 29 and September 5 were entitled to the protections of the FMLA, Defendant will then have to show that even with the protected absences "removed from the calculus," it would still have fired Defendant. *Conoshenti*, 364 F.3d at 147-48 (citing *Price Waterhouse*, 490 U.S. at 276-77, 109 S.Ct. 1775). There has been neither discovery nor argument on this point and it would therefore be premature to decide the matter on summary judgment even if the issue of Plaintiff's FMLA eligibility for his August 7, August 9 and September 5 absences had been resolved.

58

## D. Defendant Silka's liability

### 1. Silka's liability as city manager

Silka has been sued in both his official and individual capacities. The real party in interest in an official-capacity suit is the government entity and not the named official, and a plaintiff who seeks to recover damages in an official-capacity suit "must [therefore] look to the government entity itself." *Kentucky v. Graham*, 473 U.S. 159, 165-66, 105 S.Ct. 3099, 3105, 87 L.Ed.2d 114, 121 (1985). Indeed, such suits "generally represent only another way of pleading an action against an entity of which an officer is an agent." *Graham*, 473 U.S. at 165, 105 S.Ct. at 3105, 87 L.Ed.2d at 121 (quoting *Monell v. N.Y. City Dep't of Soc. Servs.*, 436 U.S. 658, 690 n.55, 98 S.Ct. 2018, 2035 n.55, 56 L.Ed.2d 611, 635 n.55 (1974)). So long as "the government entity receives notice and an opportunity to respond," which the City has in the instant case, "an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity." *Graham*, 473 U.S. at 166, 105 S.Ct. at 3105, 87 L.Ed.2d at 121 (citation omitted). In addition, where as here the named official no longer holds the official position under which he is being sued, his successor in office automatically becomes his successor in the action as well. *Id.* & n.11 (citations omitted); *see also* Fed. R. Civ. P. 25(d); Fed. R. App. P. 43(c)(2).

"[T]he only immunities available to the defendant in an official-capacity action are those that the governmental entity possesses." *Hafer v. Melo*, 502 U.S. 21, 25, 112 S.Ct. 358, 362, 116 L.Ed.2d 301, 309 (1991). While a state that has not consented to suit is immunized "from suits brought in federal court by private parties" by the Eleventh Amendment, municipalities have no such protection, *Febres v. Camden Bd. of Educ.*, 445 F.3d 227, 229 (3d Cir. 2006), and "local governmental units can be sued directly for damages and injunctive or declaratory relief." *Graham*, 473 U.S. at 167 n.14, 105 S.Ct. at 3106, n.14, 87 L.Ed.2d at 122 n.14 (citations omitted). Silka therefore has no immunity in his

59

official capacity. He is not, however, prejudiced by that fact since in his official capacity he is merely a surrogate for the City and therefore has no individual liability.

## 2. Silka's personal liability

### a. Personal liability under the FMLA

Defendant has argued that Silka possesses qualified immunity from suit in his individual capacity in this action. Before reaching that issue, however, the Court must determine whether the FMLA even allows a public official to be sued in his individual capacity. Although the Third Circuit has never addressed the issue of the individual liability of either public or private officers, this Court has previously found individual private officer liability under the FMLA, *Lynch*, 2007 WL 2407276, at *22, 2007 U.S. Dist. LEXIS 60835, at *66 -67 (citing *Hewett v. Willingboro Bd. of Educ.*, 421 F.Supp.2d 814, 817-18 & n.4 (D.N.J. 2006)), and, indeed, there seems to be little dispute over that issue. *See Darby v. Bratch*, 287 F.3d 672, 681 (8th Cir. 2002); *Smith v. Genesis Ventures* I, LLC, Civil No. 06-1473, 2006 WL 3592330, at *4, 2006 U.S. Dist. LEXIS 89285, at *16 (E.D. Pa. Dec. 8, 2006); *Morrow v. Putnam*, 142 F.Supp.2d 1271, 1275 (D. Nev. 2001).

The question of public officer liability is somewhat less settled, and there is a split among the circuits that have addressed the issue. *Compare, e.g., Darby*,287 F.3d at 681 (holding that the plain language of the FMLA allows suit of public officers in their individual capacities), *with Mitchell v. Chapman*, 343 F.3d 811, 829 (6th Cir. 2003) (holding that "the FMLA's text and structure" do not permit such an action). This Court will likewise begin its analysis, as it must, with the plain language of the statute. *See Vallies*, 432 F.3d at 495.

Under the FMLA, "[t]he term 'employer' . . . includes any 'public agency', as defined in [29 U.S.C. § ]203(x)," as well as "any person who acts, directly or indirectly, in the interest of an employer

60

to any of the employees of such employer . . . ." 29 U.S.C. § 2611(4)(A)(ii)(I), (iii). A "public agency" is defined, *inter alia*, as "the government of a State or political subdivision thereof . . . ." 29 U.S.C. §§ 203(x), 2611(4)(A)(iii). The regulations provide additional clarification, stating that, "[a]s under the FLSA [Fair Labor Standards Act], individuals such as corporate officers 'acting in the interest of an employer' are individually liable for any violations of the requirements of the FMLA." 29 C.F.R. § 825.104(d).

It is clear that the City of Johnstown is an employer under the above definition. It is equally clear to the Court that Silka, as city manager with the sole power to hire and fire, was employed by the City to act in its interest; that he acted directly on Plaintiff when he fired him; and that the reasons Silka gave for Plaintiff's termination demonstrate that Silka at least purported to have been acting in the City's interest when he did so. The Court is convinced that the plain language of the FMLA renders Silka subject to suit in his individual capacity. It is not alone in its conviction. *See Modica v. Taylor*, 465 F.3d 174, 184-87 (5th Cir. 2006); *Darby*, 287 F.3d at 681 (finding "no reason to distinguish employers in the public sector from those in the private sector"); *Hewett*, 421 F.Supp.2d at 818; *Morrow*, 142 F.Supp.2d at 1275 (finding no reason why "public officials should be exempted from liability while managers in the private sector are not"); *Kilvitis v. County of Luzerne*, 52 F.Supp.2d 403, 412 (M.D. Pa. 1999) (collecting cases); *Viereck v. City of Goucester City*, 961 F.Supp. 703, 705-06 (D.N.J. 1997); *see also Luder v. Endicott*, 253 F.3d 1020, 1022 (7th Cir. 2001) (citing 29 U.S.C. § 203(d)) (holding that under the FLSA's definition of employer as "any person acting directly or indirectly in the interest of an employer in relation to an employee," a definition almost identical to that of 29 U.S.C. § 2611(4)(A)(ii)(I), a public officer "who uses his authority over the employees whom he supervises to violate their rights under the FLSA is liable for the violation").

61

The Court finds the leading cases in support of the contrary position to be unpersuasive. *Mitchell*'s reading of 29 U.S.C. § 2611(4)(A) is, to this Court, completely at odds with the words of the statute, grounded as it is in an extended analysis of the significance of the "em dash" and alleged redundancies that are simply not contained in the plain language. *See Mitchell*, 343 F.3d at 828-33; *see also Modica*, 465 F.3d at 185-86 (analyzing and rejecting *Mitchell*'s holding); *Hewitt*, 421 F.Supp. 2d at 819-821 (reviewing at length and rejecting *Mitchell*'s analysis). The other principal case, *Wascura v. Carver*, 169 F.3d 683 (11ᵗʰ Cir. 1999), never actually reached the issue of individual liability under the FMLA, holding that it was bound by a prior decision on the same issue under the essentially identical FLSA liability scheme. *Id.* at 685-87 (citing *Welch v. Laney*, 57 F.3d 1004 (11ᵗʰ Cir. 1995)). However, *Welch*'s holding that a public official, even if he can hire and fire, cannot be an employer in his individual capacity because he only has authority to act in his official capacity, *Wascura,* 169 F.3d at 686 (citing *Welch*, 57 F.3d at 1011), "had been swept away by the Supreme Court in" *Hafer*, 502 U.S. at 28, 112 S.Ct. at 363, 116 L.Ed.2d at 311-12, before both *Welch* and *Wascura* were decided. *Luder*, 253 F.3d at 1022 (noting that neither *Welch* nor *Wascura* cited *Hafer*); *see also Hafer*, 502 U.S. at 28-29, 112 S.Ct. at 363-64, 116 L.Ed.2d at 311-12 (holding that eligibility for absolute immunity is extremely limited and does not extend "to all officers who engage in necessary official acts"); *Kilvitis*, 52 F.Supp.2d at 414 & n.9, 415.

Had Congress wished to exempt public managers from individual liability "it would have done so explicitly," much as it exempted labor organizations and their agents from liability under the FLSA. *Hewett*, 421 F.Supp.2d at 821 (citing 29 U.S.C. § 203(d); *Morrow*, 142 F.Supp.2d at 1274 n.2); *Morrow*, 142 F.Supp.2d at 1275 n.3 (citing *Lee v. Coahoma County*, 937 F.2d 220, 226 (5ᵗʰ Cir. 1991)) (noting that *Lee*'s holding that a public employee was an employer under the FLSA gave Congress

"constructive notice of the court's interpretation" two years before the enaction of the FMLA). It did not. What Congress has refused to do via legislation, the Court will not impose by judicial fiat.

### b. Qualified immunity

Since the Court has determined that Silka's liability is not foreclosed by statute, it is next necessary to determine whether such liability obtains under the circumstances of this case. Silka was a public official at the time he terminated Plaintiff's employment, and as such was "entitled to qualified immunity from damage liability" if his firing of Plaintiff did not "violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Jones v. Brown*, 461 F.3d 353, 364 (3d Cir. 2006) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)).[40] To avoid deterring "able citizens from acceptance of public office" or public officials from "the unflinching discharge of their duties. . . . [t]his immunity is broad in scope and protects all but the plainly incompetent and those who knowingly violate the law." *Curley v. Klem*, 499 F.3d 199, 206 (3d Cir. 2007) (citations and internal quotation marks omitted). The immunity in question is immunity from the suit itself; it should therefore be decided "long before trial." *Id.* at 208 (citations omitted). Such early determination depends, however, on the absence of issues of fact; when material facts are in dispute they must be determined by the jury and the immunity then becomes a "mere defense." *Id.* (citation omitted).

The assessment of qualified immunity is a two-step process based on an "objective legal reasonableness" standard; although the facts known to the official are relevant, his motivation in acting

---

[40] The *Harlow* Court "express[ed] no view as to the conditions in which injunctive or declaratory relief might be available." *Harlow*, 457 U.S. at 819 n.34, 102 S.Ct. at 2739 n.34, 73 L.Ed.2d at 411 n.34. Since Silka is no longer Johnstown's city manager the Court can think of no equitable remedy it might order which would affect him in any way and will therefore not further consider the issue of his possible immunity from the equitable portion of Plaintiff's suit. *See* 29 U.S.C. § 2617(a)(1)(B) (identifying the equitable remedies of "employment, reinstatement and promotion" for violations of the FMLA).

on those facts is not. *Blaylock v. City of Philadelphia*, 504 F.3d 405, 411 (3d Cir. 2007); *Curley*, 499 F.3d at 206 (citation omitted). The Court must first ask whether the facts of the case, when "[t]aken in the light most favorable" to Plaintiff, show the violation of a constitutional or statutory right for which Plaintiff has a remedy. *Saucier v. Katz*, 533 U.S. 194, 201, 121 S.Ct. 2151, 2156, 150 L.Ed.2d 272, 281 (2001); *A.W. v. Jersey City Pub. Sch.*, 486 F.3d 791, 794 (3d Cir. 2007) (applying *Saucier* to a purely statutory violation; noting that a right without a remedy is not actionable). On a motion for summary judgment, the plaintiff has the burden at this step. *Sherwood v. Mulvihill*, 113 F.3d 396, 399 (3d Cir. 1997). If the plaintiff meets his burden, the Court must then determine whether the right was clearly established. *Saucier*, 533 U.S. at 201, 121 S.Ct. at 2155, 150 L.Ed.2d at 281.

The FMLA analysis earlier in this opinion has demonstrated that the record does, when viewed in the light most favorable to Plaintiff, show a violation of rights established by the FMLA for which the Act also provides a remedy. To decide whether those rights were clearly established, the Court must determine whether "it would . . . have been clear to a reasonable [official] what the law required under the facts alleged " *Kopec v. Tate*, 361 F.3d 772, 776 (3d Cir. 2004); *see also Curley*, 499 F.3d at 211 (holding that whether the official "made a reasonable mistake . . . is a question of law that is properly answered by the court . . ."). Here, the defendant has the burden. *Sherwood*, 113 F.3d at 399. Unlike the lawsuit itself, which "is [generally] to be decided on the law as it exists at the time the . . . court considers the case," *Hansen v. Shearson/Am. Express, Inc.*, 890 F.Supp. 416, 421 (E.D. Pa. 1995), the issue of qualified immunity is decided based on whether the law was clearly established at the time of the official's actions. *Williams v. Bitner*, 455 F.3d 186, 190 (3d Cir. 2006).

In the Third Circuit, it is not necessary to look only to binding precedent to determine the state of the law at the time of the official's decision. *Brown v. Muhlenberg Tp.*, 269 F.3d 205, 211 n.4 (3d

Cir. 2001); *Good v. Dauphin County Soc. Servs. for Children & Youth*, 891 F.2d 1087, 1092 (3d Cir. 1989). The district court may turn to the holdings of other circuits so long as there is "some [not necessarily precise] factual correspondence between [the other circuits'] relevant precedents and the conduct at issue." *Brown*, 269 F.3d at 211 n.4 (quoting *Bieregu v. Reno*, 59 F.3d 1445, 1459 (3d Cir. 1995), overruled on other grounds by *Lewis v. Casey*, 518 U.S. 343, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996); *see Oliver v. Fauver*, 118 F.3d 175, 177-78 (3d Cir. 1997)). Indeed, the Court may hold that a law is clearly established even in the face of a circuit split, so long as "'no gaping divide has emerged in the jurisprudence such that defendants could reasonably expect [the Third Circuit] to rule' to the contrary." *Id.* (citing *Bieregu*, 59 F.3d at 1459). Although they "cannot establish the law of the circuit," district court decisions from within the Third Circuit may also be relevant. *Williams*, 455 F.3d at193 n.7 (citing *Doe v. Delie*, 257 F.3d 309, 321 & n.10 (3d Cir. 2001)).

The statutory and regulatory language applicable to the case *sub judice* was the same in 2003 as it is today. The decisional law was, of course, somewhat less developed and it is therefore necessary to review the pertinent cases which would have been available to Silka in August and September of 2003. On March 19, 2002, the Supreme Court held that the FMLA required that leave be granted, "when 'medically necessary,' on an intermittent or part-time basis"; that "[t]he regulations make it the employer's responsibility to tell the employee that an absence will be considered FMLA leave"; and that "[e]mployers must give written notice of the designation, along with detailed information concerning the employee's rights and responsibilities under the Act, 'within a reasonable time after notice of the need for leave is given by the employee – within one or two business days if feasible.'" *Ragsdale*, 535 U.S. at 86-87, 122 S.Ct. at 1160, 152 L.Ed.2d at 176 (citing 29 U.S.C. § 2612(b)(1); 29 C.F.R. §§ 825.208(a) (2001), 825.301(c)).

65

As of the summer of 2003, binding precedent in the Third Circuit held that although many serious health conditions may generally be controlled by treatment, "Congress did not intend to deny FMLA protection to an employee" who suffered incapacitating flareups of a serious condition, even if they lasted less than three days and even if the employee stayed home and treated himself. *Victorelli*, 128 F.3d at 190 & n.7. *Victorelli* went on to establish a liberal standard for evaluating the complications that can turn a minor condition, which is denied FMLA protection, into a serious medical condition which is protected by the Act. *See id.* at 189. The *Victorelli* court also cited with approval a series of cases from other circuits which had found that the aggregation of possibly minor health complaints could raise an issue of material fact as to the existence of a gestalt serious health condition. *Id.* at 188 n.4 (citations omitted).

The pertinent holdings of the other circuits *circa* 2002 may be summarized as follows: When requesting leave, an employee did not need to "expressly assert rights under the FMLA or even mention the FMLA." *Tate*, 268 F.3d at 997 (citing 29 C.F.R. §§ 825.302(c), 825.303(b); *Manuel*, 66 F.3d at 761-64); *see also Price*, 117 F.3d at 1026 (holding that the employee was only required to give notice of the need for FMLA leave). Indeed, the employee only had to provide the employer with "enough information to put the employer on notice that the employee may [have been] in need of FMLA leave." *Thorson*, 205 F.3d at 381 (citing *Browning v. Liberty Mut. Ins. Co.*, 178 F.3d 1043, 1049 (8th Cir. 1999)). Notice was sufficient if it provided an employer with information indicating a potentially serious health condition and, although merely saying "'sick' did not imply a 'serious health condition,'" the adequacy of the information was to be evaluated in light of the employer's prior knowledge of the employee's condition. *Spangler*, 278 F.3d at 852 (citing *Collins*, 272 F.3d at 1008). A normally minor illness could be considered a serious health condition on the facts of a particular case, and the lack of

66

a final diagnosis "[did] not preclude FMLA leave for [an employee's] absence." *Thorson*, 205 F.3d at 380. It was not legally impossible to aggregate several possibly minor health conditions into a single serious health condition, *Price*, 117 F.3d at 1023, and high blood pressure "could be considered a 'serious health condition.'" *Oswalt*, 74 F.3d at 93.

An employee's notice that he might need FMLA leave triggered the employer's duty to "notify the employee that FMLA coverage may apply," *Tate*, 268 F.3d at 997, and either "provide FMLA time" or, "if there [was] some doubt," to inquire further by requiring the employee to obtain medical certification from his health care provider. *Spangler*, 278 F.3d at 853 (citing 29 U.S.C. § 2613(a); *Thorson*, 205 F.3d at 381-82; *Browning*, 178 F.3d at 1049). The option to require certification provided an employer with "protection from abuse of the [FMLA's] generous provisions . . . without requiring the employer "to engage in intrusive inquiries . . . ." *Manuel*, 66 F.3d at 763-64. If an employer did not avail itself of the certification provision he could, at summary judgment, find it very difficult if not impossible to establish an issue of material fact regarding the employee's purported serious health condition. *Thorson*, 205 F.3d at 381-82.

The Court is aware of only one district court case within the Third Circuit that contradicted any of the cases cited above. *Ragsdale* held that "an employer's failure to make the [FMLA] designation" does not violate 29 U.S.C. § 2615 and thereby entitle the employee to leave beyond the 12 weeks provided by the Act. *Ragsdale*, 535 U.S. at 90, 122 S.Ct. at 1162, 152 L.Ed.2d at 177. This appears to overrule the holding in *Viereck* that 29 C.F.R. § 825.208(c) allows 12 weeks of FMLA leave in addition to any leave the employee may already have taken where the employer had known that the

employee's leave qualified under the FMLA but failed to promptly designate it as such.[41] *Viereck*, 961 F.Supp. at 708. Notably, however, *Viereck* also held that a city administrator was subject to individual liability under the FMLA, *Viereck*, 961 F.Supp. at 705-06, and *Ragsdale* left that holding undisturbed.

Since Silka's duty to either grant FMLA leave or inquire further by demanding medical certification was triggered only by adequate notice of Plaintiff's serious health condition, so long as the definitions of "serious health condition" remain unchanged, the question of Silka's immunity comes down to the adequacy of that notice. Based upon its review of the cases above, the Court finds no meaningful difference between the state of the applicable law in 2003 and today, and therefore no reason not to apply its analyses of Plaintiff's claimed serious health conditions and notice thereof from earlier in this opinion. The Court therefore finds that Plaintiff provided enough information at the September 4 and September 9, 2003 due process hearings to have made it clear to a reasonable official in Silka's position that the official had a duty to inform Plaintiff of his rights and obligations under the FMLA and to inquire further if he had any questions about Plaintiff's eligibility. Silka has no immunity in Plaintiff's wrongful termination action to the extent that he based his decision to fire Plaintiff on the August 29 and September 5 absences.

There still exist issues of material fact regarding the contents of Plaintiff's notice at the August 8 meeting, however.[42] It will therefore be necessary for the jury to establish what was said before the Court can determine the adequacy of the notice and hence Silka's immunity from suit for his actions

---

[41] Although *Ragsdale* dealt with a different regulation, 29 C.F.R. § 825.700(a), *Ragsdale*, 535 U.S. at 89, 122 S.Ct. at 1161, 152 L.Ed.2d at 177, and although the Third Circuit has yet to address the viability of § 825.208(c), the regulation's status "is tenuous at best." *Roberson v. Cendant Travel Servs., Inc.*, 252 F.Supp.2d 573, 577 (M.D. Tenn. 2002).

[42] Silka did not attend the meeting, but Andrews memorialized its contents in a memorandum to Silka and, in any event, "it is a rule of agency that the knowledge of the agent is imputed to the principal in connection with any transaction conducted by the agent on behalf of the principal." *Higgins v. Shenango Pottery Co.*, 256 F.2d 504, 509 (3d Cir. 1958); *see also Cavin*, 346 F.3d at 726 n.9 (citation omitted).

68

on and after that date.[43]

**E. 42 U.S.C. § 1983**

Plaintiff seeks to enforce his rights under the FMLA not only through the statute's own enforcement mechanism, 29 U.S.C. § 2617, but via 42 U.S.C. § 1983 as well. He has once again named the City, and Silka in both his official and individual capacities, as Defendants. Section 1983 states in pertinent part as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the Unite States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and law, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . ."

The statute "means what it says"and allows private lawsuits to to enforce not only constitutional rights but statutorily-created rights as well. *City of Rancho Palos Verdes v. Abrams*, 544 U.S. 113, 119, 125 S.Ct. 1453, 1458, 161 L.Ed.2d 316, 325 (2005) (citing *Maine v. Thiboutot*, 448 U.S. 1, 4, 100 S.Ct. 2502, 65 L.Ed.2d 555 (1980)).

To establish that a person acted under color of state law, Plaintiff must show that the actor "exercised power 'possessed by virtue of state law and made possible only because the wrongdoer [was] clothed with the authority of state law.'" *West v. Atkins*, 487 U.S. 42, 49, 108 S.Ct. 2250, 2255, 101 L.Ed.2d 40, 49 (1988) (quoting *United States v. Classic*, 313 U.S. 299, 326, 61 S.Ct. 1031, 1043, 85 L.Ed.1368 (1941)). A municipality is a creation of the state, and its officers possess and exercise their authority only through state law. There is no question that the actions Silka took regarding Plaintiff's employment were all taken under color of state law.

---

[43] Plaintiff also argues that Silka cannot claim immunity for his October 17, 2003 refusal to grant post-termination FMLA leave. The immunity issue is moot, however, since, as discussed above, a non-employee cannot state a claim for denial of a benefit only available to an employee.

Municipalities are also persons for purposes of § 1983 so long as the claimed injury was caused by the "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy."[44] *Monell* 436 U.S. at 690, 98 S.Ct., 56 L.Ed.2d at 635. The record has established that Silka had "final, unreviewable discretion" to hire and fire and was therefore a policymaker. *Kneipp v. Tedder*, 95 F.3d 1199, 1213 (3d Cir. 1996) (citation omitted). His actions regarding Plaintiff's employment were therefore policy for purposes of § 1983 and, to the extent that they violated Plaintiff's rights under the FMLA, are therefore chargeable to the City under the statute. *LaVerdure, v. County of Montgomery*, 324 F.3d 123, 124-26 (3d Cir. 2003).

Plaintiff must next establish that the FMLA "creates an individually enforceable right in the class of beneficiaries to which he belongs." *Rancho Palos Verdes*, 544 U.S. at 120, 125 S.Ct. at 1458, 161 L.Ed.2d at 325 (citation omitted). This is a three-step inquiry, requiring a showing that (1) "Congress must have intended that the provision in question benefit the plaintiff"; (2) "that the right assertedly protected by the statute is not so 'vague and amorphous' that its enforcement would strain judicial competence"; and (3) that "the provision giving rise to the asserted right must be couched in mandatory, rather than precatory terms." *Blessing v. Freestone*, 520 U.S. 329, 340-41, 117 S.Ct. 1353, 1359, 137 L.Ed.2d 569, 582 (1997). It should be apparent from the discussion of the FMLA earlier in this opinion that the Act as applied to Plaintiff satisfies all three criteria. *See also Kilvitis*, 52 F.Supp.2d at 416-17.

However, establishment of a right merely raises "a rebuttable presumption that the right is

---

[44] As discussed above, Plaintiff's suit against Silka in his official capacity is just another way of stating his claim against the City. *See Graham*, 473 U.S. at 165, 105 S.Ct. at 3105, 87 L.Ed.2d at 121.

enforceable under § 1983." *Blessing*, 520 U.S. at 341, 117 S.Ct. at 1360, 137 L.Ed.2d at 582. "[T]he defendant may defeat this presumption by demonstrating that Congress did not intend" that § 1983 furnish a remedy for the rights created by the statute. *Rancho Palos Verdes*, 544 U.S. at 120, 125 S.Ct. at 1458, 161 L.Ed.2d at 325. Such intent is obvious where the statute expressly prohibits the application of § 1983. *Blessing*, 520 U.S. at 341, 117 S.Ct. at 1360, 137 L.Ed.2d at 582. It may also be inferred where the statute contains "a comprehensive enforcement scheme that is incompatible with individual enforcement under § 1983." *Id.* (citation omitted).

Plaintiff correctly notes that "'[t]he burden to demonstrate that Congress has expressly withdrawn the remedy is on the defendant,' and that a court should 'not lightly conclude that Congress intended to preclude reliance on § 1983 as a remedy." *Sabree ex rel. Sabree v. Richman*, 367 F.3d 180, 193 (3d Cir. 2004) (quoting *Golden State Transit Corp. v. Los Angeles*, 493 U.S. 103, 107, 110 S.Ct. 444, 107 L.Ed.2d 420 (1989)). Defendants have only addressed the possibility of a due process claim under § 1983, and have offered no argument regarding the applicability of § 1983 as an alternative means of recovery for violations of the FMLA itself. Although it might seem that Defendants have not met their burden, in light of recent Supreme Court and Third Circuit precedent as well as the overwhelming weight of case law from the district courts, this Court doubts that, as a practical matter, Defendants have any burden at all.

The inclusion of an "express, private means of redress in the statute itself is ordinarily an indication that Congress did not intend to leave open a more expansive remedy under § 1983" and, indeed, the existence of a more restrictive private remedy . . . has been the dividing line" between the cases in which the Supreme Court has held that § 1983 applied and those in which it has held that it did not. *Rancho Palos Verdes*, 544 U.S. at 121, 125 S.Ct. at 1458, 161 L.Ed.2d at 326. Indeed, "in *all* of

71

the cases" in which the Supreme Court has found § 1983 to be applicable, "the statute at issue did not contain a private judicial remedy (or, in most cases, even a private administrative remedy)." *A.W.*, 486 F.3d at 801 (citing *Rancho Palos Verdes*, 544 U.S. at 121, 125 S.Ct. at 1458-59, 161 L.Ed.2d at 326) (emphasis in original). The Supreme Court, has, however, expressly declined to state that the presence of an individual statutory remedy "conclusively establishes[] a congressional intent to preclude § 1983 relief," holding instead that "[t]he ordinary inference that the remedy provided in the statue is exclusive can surely be overcome by textual indication, express or implicit, that the remedy is to complement, rather than supplant, § 1983." *Rancho Palos Verdes*, 544 U.S. at 122, 125 S.Ct. at 1459, 161 L.Ed.2d at 327.

With limited exceptions, the remedial scheme set forth in 29 U.S.C. § 2617 does not complement that of § 1983. It is instead substantially more restrictive in almost every way.[45] Under the FMLA, mere violation of a right created by the Act is not in itself actionable and nominal damages are therefore not available. *See* 29 U.S.C. § 2617(a); *Conoshenti*, 364 F.3d at 143. By contrast, the rights protected by § 1983 are considered so important that they are worth vindicating in the courts even if their "deprivation has not caused actual, provable injury" and the jury may award nominal damages. *Memphis Cmty. Sch. Dist. v. Stachura*, 477 U.S. 299, 308 n.11, 106 S.Ct. 2537, 2543 n.11, 91 L.Ed.2d 249, 260 n.11 (1986).

---

[45] Both statutes allow for equitable relief and the recovery of attorney's fees and other costs of litigation. 29 U.S.C. § 2617(a)(1)(B), (a)(3); 42 U.S.C. § 1983; *Collins v. Alco Parking Corp.*, 448 F.3d 652, 656-57 (3d Cir. 2006). The FMLA mandates the award of prejudgment interest, 29 U.S.C. § 2617(a)(1)(A)(ii), while 42 U.S.C. § 1983 leaves it to the discretion of the district court. *See Savarese v. Agriss*, 883 F.2d 1194, 1207 (3d Cir. 1989). The liquidated damages provision of the FMLA, with the affirmative defense of the actor's good faith reasonable belief in the non-violative nature of his actions, 29 U.S.C. § 2617(a)(1)(A)(iii), is somewhat analogous to the punitive damages available under § 1983 upon a showing of "reckless or callous disregard for the plaintiff's rights, as well as intentional violations of federal law." *See Savarese*, 883 F.2d at 1204 (quoting *Smith v. Wade*, 461 U.S. 30, 51, 103 S.Ct. 1625, 1651, 75 L.Ed.2d 632, 648 (1983)). However, as will be clear from the discussion *infra*, the liquidated damages of § 2617 are in lieu of rather than a complement to punitive damages available under § 1983.

At law, the FMLA provides remedies only for actual economic injury, which is defined as (1) lost "wages, salary, employment benefits, or other compensation"; *or* (2) costs incurred by the employee due to the employer's refusal to grant leave up to "a sum equal to 12 weeks of wages or salary . . . ." 29 U.S.C. § 2617(a)(1)(A)(i). Total recovery is limited to twice the employee's actual economic loss plus interest although, upon a showing by the defendant that his violation of the FMLA was in good faith based on reasonable grounds for believing that his violative act or omission was not a violation, the court may reduce the award to actual damages plus interest. 29 U.S.C. § 2617 (a)(1)(A)(iii). In comparison, § 1983 permits recovery for economic loss of any sort as well as for pain, humiliation, damage to reputation, and "mental anguish and suffering." *Pryer v. Slavic*, 251 F.3d 448, 451-52 (3d Cir. 2001); *Allah v. Al-Hafeez*, 226 F.3d 247, 250 (3d Cir. 2000). Moreover, the amount of the recovery in a § 1983 action is not capped by statute but rather "determined by principles derived from the common law of torts," thus creating the potential for much larger awards than those available under 29 U.S.C. § 2617. *Memphis Cmty. Sch. Dist.*, 477 U.S. at 306, 106 S.Ct. at 2542, 91 L.Ed.2d at 258.

The FMLA has no provision for punitive damages. *See* 29 U.S.C. § 2617. Section 1983 does, and although they are not available against a municipality they "are available in a suit against an official personally." *Graham*, 473 U.S. at 167 n.13, 105 S.Ct. at 3106 n.13, 87 L.Ed.2d at 122 n.13. Punitive damages may be imposed to punish and deter sufficiently odious behavior even in the absence of actual injury; a jury may therefore award punitive damages even when it does not award compensatory damages.[46] *Memphis Cmty. Sch. Dist.*, 477 U.S. at 307 n. 9, 106 S.Ct. at 2543 n.9, 91 L.Ed.2d at 258

---

[46] This Court notes that the Supreme Court's decision limiting punitive damages in *Exxon Shipping Co. v. Baker*, No. 07-219, 2008 WL 2511219, 2008 U.S. LEXIS 5263 (U.S. June 25, 2008), suggests the possibility of new limitations on punitive damages in § 1983 actions as well. To the extent that such limits could affect the interplay between the remedies available under the FMLA and § 1983, the decision merits brief discussion.

n.9;. *Erwin v. County of Manitowoc*, 872 F.2d 1292, 1299 (7th Cir. 1989); *Basista v. Weir*, 340 F.2d

74, 87-88 (3d Cir. 1965).

---

In *Exxon*, which involves maritime common law as applied to cases arising from the *Exxon Valdez* supertanker oil spill in 1989, the Supreme Court for the first time considered a "common-law standard of excessiveness" for punitive damages. *Exxon*, 2008 WL 2511219, at *4, 16, 2008 U.S. LEXIS 5263, at *9, 55 (citations omitted) (noting that the Supreme Court's previous punitive damages decisions had only dealt with due process issues in cases brought under state law). The Court found that punitive damages are aimed "principally at retribution and deterring harmful conduct" and that, just like any other penalties, they "should be reasonably predictable in [their] severity." *Exxon*, 2008 WL 2511219, at *12, 16, 2008 U.S. LEXIS 5263, at *38, 56. Based on its "experience with attempts to produce consistency in the analogous business of criminal sentencing," the Supreme Court concluded that nothing but "a quantified approach" to punitive damages would produce the desired uniformity. *Exxon*., 2008 WL 2511219, at *18, 2008 U.S. LEXIS 5263, at *59.

The Supreme Court found that it could best meet its goal by "pegging punitive to compensatory damages using a ratio or maximum multiple." *Exxon*, 2008 WL 2511219, at *19, 2008 U.S. LEXIS 5263, at *63; *see also Exxon*, 2008 WL 2511219, at *19, 2008 U.S. LEXIS 5263, at *64 (citing *State Farm Mut. Ins. v. Campbell*, 538 U.S. 408, 425, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003); *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 580, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996)) (noting that the ratio of compensatory to punitive damages is also a "central feature in [the Supreme Court's] due process analysis"). It concluded that a "fair upper limit" on punitive damages in a maritime case such as the one before it was an amount equal to the amount of compensatory damages. *Exxon*, 2008 WL 2511219, at *21, 2008 U.S. LEXIS 5263, at *76.

Although *Exxon* is a maritime law case, it is clear that the Supreme Court intends that its holding have a much broader application. *See Exxon*, 2008 WL 2511219, at *21, 2008 U.S. LEXIS 5263, at *69-76 (citations omitted) (examining studies and state law damages schemes that do not involve claims under maritime law to determine the proper ratio of punitive to compensatory damages in *Exxon*). *Exxon*'s 1:1 ratio of punitive to compensatory damages is the same as the 1:1 ratio between liquidated and compensatory damages in 29 U.S.C. § 2617(a)(1)(A)(i)- (iii). At first blush, and especially in light of the good faith, reasonable grounds defense available for the mitigation of liquidated damages under 29 U.S.C. § 2617(a)(1)(A)(iii), which at least implies the possibility of a punitive component, the *Exxon* ratio suggests a degree of commonality between the remedies available under the FMLA and § 1983 that could raise some doubt as to whether the FMLA has in fact preempted § 1983.

Even putting aside the fact that the liquidated damages provision of the FMLA is, whatever its implications, not overtly punitive, the 1:1 ratio imposed by *Exxon* is limited to cases such as *Exxon* itself. *See Exxon*, 2008 WL 2511219, at*21, 2008 U.S. LEXIS 5263, at *75-76. Most notably, the Supreme Court has distinguished *Exxon*, a case in which the offensive conduct was neither intentional nor malicious, and where "the total relevant compensatory damages" were $507.5 million, from cases, readily cognizable under § 1983, in which "intentional or malicious conduct" may be involved and where the economic harm may be "modest." *Exxon*, 2008 WL 2511219, at *21-22, 2008 U.S. LEXIS 5263, at *75-76, 80; *cf. Memphis Cmty. Sch. Dist.*, 477 U.S. at 307, 308 & n.11, 106 S.Ct. at 2543 & n.11, 91 L.Ed.2d at 259, 260 & n.11 (citing *Carey v. Piphus*, 435 U.S. 247, 264, 266, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978)) (noting that a claim for the transgression of even a fundamental constitutional right, while cognizable under § 1983, may only afford recovery of nominal damages absent a showing of actual injury). Indeed, the Supreme Court held that "willful or malicious action, taken with a purpose to injure," demonstrates "an enhanced degree of punishable culpability." *Exxon*, 2008 WL 2511219, at *13, 2008 U.S. LEXIS 5263, at *40 (citations omitted). Even more to the point, it reiterated that "[l]ow awards of compensatory damages may properly support a higher ratio [of punitive to compensatory damages] if, for example, a particularly egregious act has resulted in only a small amount of economic damages," and endorsed the proposition that "an award of nominal damages . . . is enough to support a further award of punitive damages, when a tort, . . . is committed for an outrageous purpose, but no significant harm has resulted." *Exxon*, 2008 WL 2511219, at *13, 2008 U.S. LEXIS 5263, at *41 (quoting *BMW*, 517 U.S. at 582, 116 S.Ct. 1589, 134 L.Ed.2d 809; 4 Restatement (Second) of Torts § 908, Comment c., p. 465).

For the reasons given above, this Court is confident that *Exxon* does not automatically limit an award of punitive damages under § 1983 to an amount equal to compensatory damages; that *Exxon* has therefore not imposed even a superficial resemblance between the remedies available under the FMLA and § 1983; and that as a result preemption of § 1983 by the FMLA is no less certain today than it was before *Exxon* was decided.

Finally, an employee's private right of action under the FMLA is automatically terminated upon commencement of a suit by the Secretary of Labor "unless the action . . . is dismissed without prejudice on motion of the Secretary." 29 U.S.C. § 2617(a)(4). There is no such preemptive device in the language of § 1983 and the plaintiff remains the master of his suit throughout.

It is clear to the Court that the remedial scheme created by the FMLA is far more restrictive than that of § 1983. It is equally apparent that the two schemes are contradictory rather than complementary and that to permit suit under § 1983 for violation of a right created by the FMLA would negate Congress's clearly expressed intent to limit both the grounds for and amount of recovery for such violations. Those limitations are an integral part of the Act's attempt "to balance the demands of the workplace with the needs of families," by protecting both employees and the "legitimate interests off employers . . . ." 29 U.S.C. § 2601(b)(1), (4). Allowing a § 1983 suit on a FMLA claim would destroy that balance.

Although the Supreme Court and the Third Circuit have yet to directly address the issue of the inherent incompatibility of the FMLA and § 1983 remedial schemes, almost every decision of which this Court is aware has held, on reasoning similar to that presented above, that the FMLA provides the exclusive means of recovery for violation of rights created by the FMLA. *See, e.g., Lucht v. Encompass Corp.*, 491 F.Supp.2d 856, 866-67 (S.D. Iowa 2007) (holding in a wrongful discharge action that the FMLA is the exclusive remedy for claims arising under the Act); *Hilborn v. Cordaro*, 3:cv-06-0223, 2007 WL 2903453, at \*6 n.13, 2007 U.S. Dist. LEXIS 76879, at \*22 n.13 (M.D. Pa. Sept. 28, 2007) (holding that "the FMLA provides a comprehensive remedial measur[e] that evinces Congress' intent to foreclose the use of a § 1983 action"); *O'Neill v. Major Brands, Inc.*, Case number 4:06cv0141 TCM, 2006 WL 1134476, at \*2-3, 2006 U.S. Dist. LEXIS 27537, at \*7-8 (E.D. Mo. Apr.

26, 2006) (dismissing a count of the complaint seeking damages "not within the exclusive statutory remedial scheme of the FMLA. . . . for failure to state a claim"); *Coleman v. City and County of Broomfield*, Civil Action No. 05-cv-00847-WYD-BNB, 2005 WL 3527290, at \*4, 2005 U.S. Dist. LEXIS 38259, at \*10-11 (D. Colo. Dec. 22, 2005) (citation omitted) (finding that to allow recovery under a § 1983 claim that mirrored a FMLA claim "would provide the plaintiff with two bites at precisely the same apple"); *Cisneros v. Colorado*, No. Civ.A. 03CV02122WDMCB, 2005 WL 1719755, at \*10-11, 2005 U.S. Dist. LEXIS 40045, at \*33-36 (D. Colo. July 22, 2005) (citations and internal quotation marks omitted) (agreeing with the "vast majority of district courts" that "Congress intended the specific remedies set forth in § 2617 [to] be the exclusive remedies available for a violation of the FMLA"); *Rosania v. Taco Bell of Am., Inc.*, 303 F.Supp.2d 878, 881 (N.D. Ohio 2004) (holding that "[29 U.S.C.] § 2617 provides the exclusive remedies for an employer's violation of the FMLA"); *Alvarez v. Hi-Temp, Inc.*, No. 03 C 2610, 2004 WL 603489, at \*5, 2004 U.S. Dist. LEXIS 4755, at \*17 (N.D. Ill. Mar. 24, 2004) (holding in a common law tort case that the plaintiff's "legal recourse for violations of [rights arising from the FMLA was] limited to the damages available under the FMLA"); *Cavin v. Honda of Am. Mfg., Inc.*, 138 F.Supp.2d 987, 992-93 (S.D. Ohio 2001) (finding that "the restricted right to bring a FMLA action," when coupled with the "detailed specific remedies" Congress provided in the Act itself, demonstrated Congress's intent that 29 U.S.C. § 2617 be the exclusive remedy for violations of the Act); *Kilvitis*, 52 F.Supp.2d at 418 (holding that the "comprehensive detailed enforcement provisions of the FMLA show an intention of Congress" that the remedies provided by the Act be exclusive); *Desrochers v. Hilton Hotels Corp.*, 28 F.Supp.2d 693, 694-95 (D.Mass 1998) (holding that the FMLA's comprehensive remedial scheme preempts a state law claim "based on rights granted by the [Act]"); *O'Hara v. Mt. Vernon Bd. of Educ.*, 16 F.Supp.2d 868,

892-95 (S.D. Ohio 1998) (citing *Saunders v. Hunter*, 980 F.Supp. 1236 (M.D. Fla. 1997); *Barfield v. Madison County*, 984 F.Supp. 491 (S.D. Miss. 1997)) (analyzing the FMLA/§ 1983 dichotomy in detail; noting that the "FMLA's enforcement scheme is modeled on" that of the FLSA and that other courts have held that § 1983 could not be used to enforce rights arising under the FLSA; and concluding that the FMLA contains the exclusive means of enforcing rights arising under the Act); *Jolliffe v. Mitchell*, 971 F.Supp. 1039, 1044-45 (W.D. Va. 1997) (holding that since "the injuries to which the [FMLA] applies are narrowly drawn and the remedies provided fully cover those injuries . . . the FMLA provides a comprehensive enforcement scheme which forecloses a section 1983 claim"); *Clay v. City of Chicago Dept. of Health*, No. 96 C 3684, 1996 WL 613164, at *2, 1996 U.S. Dist. LEXIS 15626, at*6 (N.D. Ill. Oct. 22, 1996) (citing *Golden State*, 493 U.S. at 106) (holding that "Section 1983 is not available to enforce violations of federal statutes that otherwise have comprehensive enforcement schemes"); *see also Kendall v. City of Chesapeake, Va.*, 174 F.3d 437, 443 (4th Cir. 1999) (citations and internal quotation marks omitted) (finding that § 1983 could not be used to enforce rights created by the FLSA, since it was "hard to believe that Congress intended to preserve the § 1983 right of action when it created so many specific statutory enforcement mechanisms" in the FLSA); *Arban v. West Pub. Co.*, 345 F.3d 390, 408 (6th Cir. 2003) (citations omitted) (finding that "[t]he legislative history of the FMLA reveals that Congress intended the remedial provisions of the FMLA to mirror those in the FLSA").

By contrast, holdings that 29 U.S.C. § 2617 does not preempt 42 U.S.C. § 1983 are rare. The Court could find only three. *See Horne v. Parkdale Mills, Inc.*,1:00cv181, 2000 U.S. Dist. LEXIS 21272, at *5 (W.D.N.C. Oct. 6, 2000) (D. Md. 1998) (no Westlaw cite available) (citing *Knussman v. State of Md.*, 16 F.Supp.2d 601 (D. Md. 1998)) (Cogburn, M.J.) (finding, in the magistrate judge's

report and recommendation, that based on *Knussman* and its "own [unexplicated] review of the FMLA and surrounding materials . . . [there is] no explicit or implicit intent of Congress to foreclose plaintiffs from traditional state-law remedies in tort, such as intentional infliction of emotional distress" and therefore recommending that "defendant's motion to Strike or Dismiss or be DENIED"), not followed by *Horne v. Parkdale Mills, Inc.*,1:00cv181, 2001WL 1019450, at *3, no LEXIS cite available (W.D.N.C. Jan. 19, 2001) (granting motion to dismiss for other reasons);[47] *Knussman*, 16 F.Supp.2d at 609-10 (finding that the FMLA's enforcement provisions were not so comprehensive as to imply exclusivity and that finding, coupled with the Act's lack of "a detailed administrative [grievance] procedure," indicated that "Congress did not intend to foreclose FMLA enforcement by actions under § 1983 . . ."); *Peterson v. Slidell Mem'l Hosp. and Med. Ctr.*, Civ. A. No. 96-2487, 1996 WL 732840, at *2, 1996 U.S. Dist. LEXIS 18944, at *5-7 (E.D. La. Dec. 16, 1996) (allowing simultaneous FMLA and § 1983 claims to proceed without considering the issue of their compatibility).

Of the three cases cited above, only *Knussman* contains a meaningful analysis and this Court is not persuaded that the absence of an administrative remedy is sufficient to allow application of § 1983 where such application would destroy a carefully crafted scheme that has limited causes of action and remedies within the FMLA to a much smaller universe than would be available under § 1983. Especially in light of the Third Circuit's conclusion, after analyzing *Rancho Palos Verdes*, that the Supreme Court has "upended the *Blessing* 'presumption'" that a statutorily-created right is enforceable under § 1983, and replaced it, in cases where the statute that created the right also contains a private remedy, with a "presumption that this remedy is to be exclusive," *A.W.*, 486 F.3d at 801, this Court

---

[47] That the Court has been forced to cite to a magistrate judge's rejected report and recommendation merely serves to underline the paucity of support available for the proposition that § 1983 provides any remedy for violations of the FMLA.

concludes that there is no meaningful question regarding the applicability of § 1983 to claims arising under the FMLA and that 29 U.S.C. § 2617 is the exclusive remedy for those claims. The Court therefore grants summary judgment for Defendants on the issue of their liability under 42 U.S.C. § 1983 and dismisses the claim.

## IV. CONCLUSION

For the foregoing reasons the Court finds as follows:

1.  The remedial scheme of 42 U.S.C. § 1983 is inapplicable to claims arising from alleged violations of rights created by the FMLA, and Plaintiff's claims under 42 U.S.C. § 1983 shall therefore be dismissed with prejudice. *See In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314, 1332 (3d Cir. 2002) (holding that futility is ground for dismissal with prejudice).

2.  The City of Johnstown and Jeffrey Silka are employers within the meaning of the FMLA.

3.  As a matter of law Silka has no immunity from suit for any violations of Plaintiff's rights under the FMLA he may have committed on or after September 4, 2003 and September 9, 2003.

4.  There is a question of material fact regarding the content of the notice Silka received from Plaintiff on August 8, 2003. The Court will determine adequacy of the notice and hence Silka's immunity from suit for any violations of Plaintiff's rights under the FMLA Silka may have committed between August 8, 2003 and September 4, 2003 after the question of fact has been resolved.

5.  Plaintiff was an eligible employee under the FMLA until his termination on September 10, 2003. He was not, however, an eligible employee after that date, and Plaintiff's

79

claims arising from Defendant's refusal to grant post-termination leave and reinstatement will therefore be dismissed with prejudice. *See NAHC*, 306 F.3d at 1332.

6. There is an issue of material fact as to whether Plaintiff's syncopal episodes of September 5, 2003 occurred and hence established a serious health condition under 29 C.F.R. § 825.114(a)(1). If the jury finds that they did occur, there is also an issue of material fact as to whether Plaintiff's absences of August 7, 21, 22, and 29 of 2003 were caused by the same condition that caused the syncopal episodes.

7. As a matter of law, Plaintiff's syncopal episodes do not make out a serious health condition under 29 C.F.R. § 825.114(a)(2)(i).

8. As a matter of law, Plaintiff's absences on August 1, 14 and 15 of 2003 were not due to a serious health condition. He is therefore barred from claiming any violation of the FMLA in relation to employment actions taken as a result of those absences.

9. As a matter of law, Plaintiff's high blood pressure and hypokalemia were chronic conditions. There is a question of material fact as to whether Plaintiff's claimed sinusitis and bad teeth were chronic conditions.

10. As a matter of law, Plaintiff's dental problems were not by themselves a serious health condition.

11. There is an issue of material fact as to whether Plaintiff's high blood pressure, hypokalemia and sinusitis alone or together, or in any combination with Plaintiff's dental problems, caused any or all of his absences on August 7, 21, 22, 29 and September 5 of 2003.

12. As a matter of law, Plaintiff did not provide Defendants with adequate notice following

his absences on August 1, 21 and 22. He is therefore barred from claiming any violation of the FMLA in relation to employment actions taken as a result of those absences.

13. There is an issue of material fact as to the contents of Plaintiff's August 8, 2003 notice to Defendants regarding the reasons for his August 7, 2003 absence, and therefore the Court will be able to decide the issue of adequacy only after the finder of fact determines the contents of the notice.

14. As a matter of law, Plaintiff's notice to Defendants on September 4, 2003 after his absence of August 29, 2003, and his notice of September 9, 2003 after his absence of September 5, 2003 satisfied the requirements of the FMLA.

15. There is an issue of material fact as to the contents of Plaintiff's August 8, 2003 notice to Defendants regarding his possible need for future leave, and therefore the Court will be able to decide the issue of adequacy only after the finder of fact determines the contents of the notice.

16. As a matter of law, Plaintiff's notices of his possible need for future leave given on September 4 and 9, 2003 were adequate, as was the notice of the possible need for surgery also given on September 4, 2003.

17. As a matter of law, Plaintiff did not at any time provide Defendants with adequate notice that he might require an extended leave for the purpose of rest and recovery from his various maladies.

18. Plaintiff's wrongful termination claim is properly cognizable as retaliation or discrimination rather than as a claim for interference.

19. As a matter of law, Defendants did not interfere with Plaintiff's rights under the FMLA

81

by requiring him to furnish a medical excuse after each absence.

20. As a matter of law, Defendants did not interfere with Plaintiff's rights under the FMLA by failing to offer him prospective leave.

21. As a matter of law, Defendants did not interfere with Plaintiff's rights under the FMLA when they did not offer him leave for surgery.

22. As a matter of law, there is direct evidence that Plaintiff's termination was based at least in part on his absences in August and September of 2003. If the jury finds that any or all of his absences on August 7, August 29 and September 5 were entitled to protection by the FMLA, Defendants must then show at trial that even with those protected absences removed from the calculus Silka would still have fired Plaintiff.

23. Should Plaintiff prevail in the liability phase of the trial, he will not be eligible for reinstatement unless he can show that he is able to perform all the duties of his former job, including reliably showing up for a full week's work.

An appropriate order follows.

## ORDER

**AND NOW**, this 30th day of June, 2008, the Court having considered the Motion for Summary Judgment of Defendants, City of Johnstown and Jeffrey Silka Pursuant to Federal Rule of Civil Procedure 56, (Document No. 41), and Plaintiff's Partial Motion for Summary Judgment, (Document No. 45), for the foregoing reasons it is **HEREBY ORDERED** that Defendant's motion is **GRANTED** in part and **DENIED** in part, and Plaintiff's motion is also **GRANTED** in part and **DENIED** in part.

**IT IS FURTHER ORDERED** as follows:

1.  Plaintiff's claims pursuant to 42 U.S.C. § 1983 are **DISMISSED** with prejudice;

2.  Plaintiff's claims of interference arising from Defendants' refusal to grant Plaintiff post-termination FMLA leave and reinstatement are **DISMISSED** with prejudice;

3.  Plaintiff's claim for wrongful termination in violation of the FMLA shall be tried as a claim of discrimination and/or retaliation rather than as a claim of interference;

4.  The remainder of Plaintiff's claims, all of which are for interference with his rights under the FMLA, are **DISMISSED**;

5.  Plaintiff's absences of August 1, 14, 15, 21 and 22, 2003 were not protected by the FMLA and any of Plaintiffs' claims arising solely from those absences are therefore **DISMISSED**;

6.  To establish that his August 7, 2003 absence was protected by the FMLA, Plaintiff must show both adequacy of the notice he provided on August 8, 2003 and that the absence was in fact caused by a serious health condition;

7.  To establish that his absences of August 29 and September 5, 2003 were protected by

the FMLA, Plaintiff need only show that they were in fact caused by a serious health condition;

8. Defendant Silka's claim of immunity from suit for terminating Plaintiff's employment in retaliation for Plaintiff's absences on August 29, 2003 and/or September 5, 2003 is **DENIED**;

9. Defendant Silka's claim of immunity from suit for terminating Plaintiff's employment in retaliation for his absence on August 7, 2003 will be decided by the Court after the finder of fact determines the content of the notice Plaintiff provided to Defendants on August 8, 2003 regarding his August 7, 2003 absence.

10. Since, if Plaintiff establishes that one or more of his absences on August 7, August 29 and September 5, 2003 were protected by the FMLA, Defendants then have the burden of showing that they would have terminated Plaintiff even absent consideration of the protected absences, the Court will reopen discovery on that issue only for 60 days following the filing of this order.

11. All deadlines contained in the Court's Sixth Amended Pretrial Order, (Document No. 96), are continued until further notice.

BY THE COURT:

**KIM R. GIBSON**
**UNITED STATES DISTRICT JUDGE**